(No. 91564

CARPETLAND U.S.A., INC., Appellee, v. THE ILLINOIS DEPARTMENT OF EMPLOYMENT SECURITY *et al.*, Appellants.

*Opinion filed June 20, 2002.—Rehearing denied August 29, 2002.*

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Darryl B. Simko and John P. Schmidt, Assistant Attorneys General, of Chicago, of counsel), for appellants.

Richard L. Marcus and Ellen P. Zivitz, of Sonnenschein, Nath & Rosenthal, of Chicago, for appellee.

JUSTICE GARMAN delivered the opinion of the court:

Carpetland U.S.A., Inc. (Carpetland), sought administrative review in the circuit court of Cook County of a decision by Lynn Quigley Doherty, Director of Employment Security, which adopted the report and proposed decision of a representative of the Department of Employment Security (Department) before whom a hearing had been held. The Director determined that floor

measurers and floor-covering installers whose services were utilized by Carpetland were employees rather than independent contractors and, therefore, were not exempt under section 212 of the Unemployment Insurance Act (Act) (820 ILCS 405/212 (West 2000)). The Director further found that Carpetland owed $38,977.17, plus interest and penalties, in unpaid unemployment insurance contributions for 1991. The circuit court confirmed the Director's decision. On appeal, a divided court reversed, finding the Director's decision clearly erroneous. We granted the Department's petition for leave to appeal (see 177 Ill. 2d R. 315). We agree with the appellate court that the agency decision as to the installers was clearly erroneous and, therefore, affirm in part. Because we do not find clear error in the agency decision as to the measurers, we reverse in part.

Under the Act, an employer's liability for making contributions and an employee's eligibility for benefits are dependent, in part, on the existence of an employment relationship between them. The statutory definition of employment, rather than common law principles of master and servant or independent contractor, governs this determination. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 396-97 (2001). The Act defines "employment," in relevant part, as "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 2000). Carpetland, a corporation "which has or *** had in its employ one or more individuals performing services for it within this State" (820 ILCS 405/204 (West 2000)), is an employing unit. At issue is whether 12 measurers and 259 installers whose services were utilized by Carpetland during the relevant time period were employees, on whose behalf Carpetland was required to make unemployment insurance contributions, or independent contractors, for whom the Act carves out an exemption:

"Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—

A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

C. Such individual is engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212 (West 2000).

Because these conditions are stated in the conjunctive, all three must be satisfied for the independent contractor exception to apply. *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 75 (1991). The burden of proof is on the presumptive employer, who is claiming the benefit of the exemption. Thus, the terminology used by the parties to describe their relationship is not controlling. The determination must be made, instead, based on the facts relevant to the three conditions. *Jack Bradley*, 146 Ill. 2d at 75-76. In addition, because the Act was passed with the public welfare in mind, its terms should be liberally construed in favor of inclusion. *Jack Bradley*, 146 Ill. 2d at 75.

The Director and the circuit court concluded that none of the three conditions of section 212 were met. The appellate court reached the opposite conclusion. 319 Ill. App. 3d 1068.

## BACKGROUND

Carpetland is a retailer of floor coverings, primarily carpeting. During 1991, Carpetland operated 17 stores in Illinois. Carpetland's retail price for its products does not include measuring the customer's floor to determine the dimensions needed or installation of the floor covering.

However, the majority of Carpetland's sales, approximately 75%, are to customers who request that Carpetland arrange for installation of the floor covering by signing a sales agreement containing the following provision:

"INSTALLATION BY SUBCONTRACTOR

It is understood that Carpetland will not install said materials but that by the acceptance of this proposal you authorize Carpetland to contract with a subcontractor on [your] behalf to make the installation. You authorize Carpetland to issue to said subcontractor on [your] behalf an installation work order with these specifications. You agree to pay to Carpetland the amount specified herein which shall include the price of all materials and the installation charges which are payable to the subcontractor on your behalf."

At the agency hearing, Carpetland's vice president of operations, three installers, one measurer, and an employment consultant testified before the Department's representative.

### Installers

Joseph H. Smith testified that he had been in the business of carpet installation for 27 to 28 years. He is now self-employed with a company known as J. Smith Floors, Inc. During 1991, he was the self-employed president of an Indiana corporation known as Tile Works, Inc., which sold and installed floor coverings. Smith estimated that about 75% of Tile Works' business consisted of performing installations for retail or commercial customers of Carpetland and other companies. About 25% consisted of in-house sales and installations. Of the portion of his business that involved installations for other companies, about 30% of the work was for Carpetland; the rest was for Builder's Square, Colortile, and other retailers who were competitors of Carpetland. At the time of the hearing, Smith continued to do work for Carpetland, under the same arrangement that existed in 1991.

When Carpetland has a job for Smith in Illinois, he is contacted directly by the salesperson and, after accepting the job, receives a work order via fax. The work order contains the name and contact information for the customer and a description of the work to be done, including a diagram for placement of the floor covering. Depending on the job, he might have to visit the site to evaluate it. He occasionally declines jobs if his schedule is full, the job is "too big or too small," or the job will not pay well.

Smith has a basic price for various types of jobs, which he adjusts up or down depending on the size and complexity of the job. He quotes a price to Carpetland and, if they reach an agreement, he takes the job. If not, the job will go to someone else. He includes in his quoted price any anticipated incidental expenses such as parking. If his costs are less than his original estimate, he retains the extra profit. If the job costs him more than his estimate, he suffers the loss.

The actual installation work is performed by Smith's employees. In general, he has 10 to 12 employees but increases that number to 25 or 30 during busy seasons. He uses subcontractors when he is shorthanded. Carpetland is not involved in his staffing decisions, does not suggest or recommend that he increase or decrease staff, and does not refer potential employees to him. Any training needed is provided by Smith.

One of his employees picks up the carpeting or other material at Carpetland and transports it to the customer's site. Smith supervises the actual installation. Only rarely will someone from Carpetland be present during the installation.

Smith provides any materials or supplies needed for installation, such as adhesives for vinyl or tile, mortars and grouts for ceramic and marble, and seam tape, tack strips, and other materials for carpeting. When purchas-

ing these supplies, Smith determines which suppliers he will use and deals directly with suppliers who sell only "to the trade." Smith also provides all of the necessary tools, in which he estimated he has invested $15,000 to $18,000. In addition, Smith owns three delivery trucks and maintains a 3,500 square foot warehouse and an office with a staff of four.

After completing a job for Carpetland, Smith submits an invoice on his company stationery, accompanied by a copy of the work order. Usually, he does this by mail. Carpetland pays him twice a month, with a check made out to his company. He estimated that his company does about one job per month for Carpetland.

Smith guarantees his work for one year from the date of installation. If the customer complains to Carpetland, the matter is referred to him for resolution. He does not receive complaints directly from Carpetland customers once his installers have left the customer's premises.

Smith testified that in 1991, he had an Illinois Department of Employment Security account number and a federal employer identification number. Tile Works filed a corporate tax return in 1991. Smith uses his own business cards, containing the name of his company and his own telephone number. He advertises his business in local newspapers and in the yellow pages.

James Lawson testified that he had been the sole proprietor of Lawson's Carpet Service in Decatur, Illinois, for 20 years. In 1991, approximately 75% of his business consisted of carpet installations for customers of the Carpetland store in Decatur and occasionally for the stores in Champaign and Bloomington. He continues to do business with Carpetland under the same arrangement that existed in 1991. Lawson calls the store to advise the manager that he is available for work. Sometimes, he is given work immediately. At other times, the store will call him back with assignments. He occasionally turns

down work. Lawson takes vacation or holiday time as it suits him and informs Carpetland that he will not be available.

Lawson's Carpet Service generally employs Lawson, one full-time employee, and one part-time employee. He pays his employees by the hour and pays withholding taxes and FICA on their behalf. He also makes unemployment compensation contributions for them. He hires by word of mouth or by placing newspaper ads and trains his own employees. Carpetland has never referred a potential employee to him, nor has Carpetland recommended that he hire or terminate any employee. Lawson estimated that five years of training and experience are necessary to become a fully qualified installer. The products are constantly changing and he must keep up-to-date. He communicates directly with carpet manufacturers regarding recommended installation procedures, such as which type of adhesive to use with a particular product.

After accepting a job, Lawson calls the customer directly to discuss details such as whether existing carpeting must be removed. They also set up a time for the installation. He then obtains the roll of carpeting from the store and transports it in his company's van to the customer's home or business, where he cuts it to fit.

The installer must also be able to properly prepare the floor to which the carpeting is being applied. On some jobs, he must lay a new floor or patch the existing floor before he can install the floor covering. When he finds such a situation, he explains it to the customer, quotes a price, and gets the customer's permission to do the work. Because he gives a one-year warranty, he will not do the job if the customer declines to allow him to properly prepare the floor. He also works with the customer to determine where seams will be placed. Considerations include the traffic pattern in the room and the arrange-

ment of furniture. If the customer authorizes additional services that were not included in the original estimate, Lawson will negotiate a price directly with the customer. The customer may pay him directly, or they will agree to pass the charge through Carpetland. This is likely to occur when a customer is using a credit card and wants the carpet purchase and installation to be treated as one credit transaction.

Lawson and his employees use tools owned by Lawson Carpet Service, including power tools such as stretchers, tackers, and trimmers. He purchases tools directly from suppliers. Carpetland does not lend him tools or help him acquire tools. He estimated his total investment in tools at $5,000. All supplies used in the installation process are also provided by Lawson, including tape, metal trim, staples, and knife blades.

Advertising for Lawson Carpet Service includes yellow pages ads, ads in school and church bulletins, and business cards. In addition to using the Lawson Carpet Service name, these ads include his logo. These materials do not mention Carpetland.

Lawson negotiates with Carpetland and his other clients for the cost of each job. He sets his price based on the size and complexity of the job. He charges more for carpeting a stairway, for example, than for a floor. He quotes his price to the salesperson, who might make a counteroffer. Lawson also does "contract jobs" for builders or commercial customers. He bids on a job and negotiates directly with the customer, who then purchases floor covering from Carpetland or another supplier. In these cases, he bills the customer directly for his installation services.

Only rarely does a representative from Carpetland visit a work site. This might occur if Lawson discovered a flaw in the carpeting and Carpetland was going to have to replace it, or if the quantity of carpeting provided by Carpetland was insufficient.

Lawson guarantees his work for one year. He provides one of his business cards to the customer, who may call him directly if a problem arises with the installation. The customer might also contact Carpetland and the problem would be referred to him. Lawson would make the repair, incurring the cost of new carpet if necessary. Carpetland does not reimburse him. If he determines that the problem was not his responsibility, he will charge the customer or Carpetland for the repair, as appropriate.

Lawson submits a bill to Carpetland twice a month and receives a check for the billed amount several days later. He does not participate in any employee benefit programs.

Craig Panozzo testified that he incorporated his business, Craig's Custom Tile, in 1989. In 1991, approximately 25% of the work done by his company was for the Carpetland store in Matteson, Illinois. At the time of the hearing, he continued to do ceramic and marble tile installation for retailers and builders and does remodeling work on his own.

A Carpetland employee calls Panozzo when a job comes up, usually giving him 10 to 14 days' notice. He will turn the job down if he does not have the time to do it or if the job is too big for him to do alone. If he accepts the job, he picks up a work sheet from Carpetland and the tile from the distributor in Crestwood, Illinois. All of the work he does for Carpetland is on new construction, so he does not have to visit the site before agreeing to a price per square foot, as he would have to do for a remodeling job. Panozzo provides the necessary supplies such as pads, adhesives, cement, grout, and caulk. The cost of supplies is built into his price. He also provides his own tools, such as saws, in which he has invested approximately $5,000.

Periodically, Panozzo turns in a "recap sheet" to Car-

petland, along with the worksheet for each job. He stops by Carpetland several days later to pick up a check made out to Craig's Custom Tile. When he takes a vacation, he notifies Carpetland that he will be gone. Panozzo also acknowledged that he did not have an account with the Department or a federal employer identification number.

### Measurers

Kenneth W. Weiss testified that from January to June 1991, he worked as a measurer, doing jobs subcontracted to him by GW Carpet Service (GW), a sole proprietorship of his father, Gary Weiss. The business was operated out of the elder Weiss' home. Several secretaries were employed by GW, but the measurers were "subcontractors."

Weiss estimated that 10% of the jobs he did for GW were for Carpetland and the remainder were for other floor-covering businesses. Each morning, he would call GW to pick up job assignments for that day. He was given the customers' names, addresses, and telephone numbers, the account or store that had requested each measuring job, and perhaps the name of the salesperson. Weiss would contact the customers to arrange a time to make the measurements.

After making the measurements, Weiss returned to his "personal office" in his home to make a diagram of each job. Some accounts supplied their own forms; Carpetland did not. In addition to showing the measured area to scale, the diagram noted any additional information that might be needed to calculate the cost of the floor covering or installation, such as heavy furniture that would have to be moved, or old carpeting to be taken up. Weiss placed the forms in his mailbox, where they were picked up by a messenger service for GW. GW then had the reports delivered to the stores that had ordered the work. Weiss rarely went into a Carpetland store. Occasionally, he would do so if a customer had a special

need such as a rush order that he might decide to hand-deliver as a service to the customer.

No one from Carpetland checked his work. If a mistake occurred, he remeasured. He would be paid for the additional work if the mistake turned out not to be his responsibility. If he had made the mistake, he would not be paid for the second trip.

Weiss and other measurers charged GW on a per-job basis, with additional charges for distance and particularly large jobs. He would submit daily and weekly tallies of jobs done. His check from GW was delivered each week by the same messenger who picked up his measurements. GW, in turn, billed Carpetland and the other stores. GW negotiated its fees with each of the stores and the rates were slightly different as a result.

Weiss was trained on the job by his father. Later, Weiss trained other measurers. Carpetland was not involved in any of this training. Weiss testified that he considered himself to be self-employed and that he filed a Schedule C federal tax return in 1991. GW was his only customer and he earned $7.50 per job, unless there was some adjustment for distance or size of the job. On average, Weiss would do 17 jobs per day, six days per week. He did not have his own business cards and did not do any advertising. GW had business cards and called on stores to solicit business.

When GW went out of business in June 1991, the younger Weiss and two other measurers each took over a portion of the business. Each of them paid Gary Weiss "a commission" on the accounts that they took over from GW. Several of the Carpetland stores became Weiss' accounts under this arrangement.

## Carpetland

John L. Booth, Carpetland's vice president of operations, explained that a Carpetland salesperson calculates the cost of a floor covering based on dimensions provided

by the customer. However, if the customer does not know the dimensions or wants to arrange for installation, an actual measurement is required. The salesperson has the option of doing the measuring himself or referring the job to a measuring service. If a measuring service is used, half the cost is deducted from the salesperson's commission. The salesperson explains to the customer that the measuring service is an independent business, over which Carpetland has no control, but that the salesperson will relay the customer's request as to a convenient time for the measuring to occur. After the results of the measuring are communicated to the salesperson, he recalculates the price and informs the customer of any adjustment.

Booth further testified that measurers are not Carpetland employees. They do not participate in any Carpetland employee benefit program such as insurance or paid vacation. Measurers may take vacation time or other time off without clearing it with Carpetland. Carpetland does not provide them with vehicles or reimburse them for mileage. Carpetland does not require that the measurers work only for Carpetland. Carpetland neither trains the employees of the measuring services nor instructs the measurers on the performance of their work. Measurers are not required to come to a Carpetland store for any purpose and representatives of Carpetland do not go to customer's locations to review or supervise the work of measurers. If a measuring service makes an error that results in extra cost, such as a need for additional carpeting, Carpetland holds the measurer responsible for the expense. Carpetland pays the measuring services on a per-measure basis at a rate that is negotiated individually. Different stores have different arrangements with the measuring services as to how often they are paid, usually weekly or biweekly. The measuring service submits invoices to Carpetland, on the service's own bill or letterhead. Carpetland pays the amount of the invoice, without deductions for payroll taxes.

Carpetland does not enter into written contracts with the various measuring services, but does require that each service provide certificates of automobile and liability insurance as a condition of doing business.

Carpetland specifically informs its customers that it does not provide installation services. If the customer wants to have the floor covering installed, Carpetland will subcontract the work to an installer. Booth identified a form that was used in all Carpetland stores as an "installation subcontract." The form contains the customer's name and address, the material to be installed, the areas to be covered, and the installation price. The price of installation is negotiated between the store and the installer and is based on a base price per square yard, plus any "add-ons" such as preparation of the floor. The base price varies from store to store and, within a single store, from installer to installer. Installers are free to decline jobs and do so on occasion. Once the installer accepts the job, this document is signed by the store manager and the installation subcontractor. The installer then contacts the customer to arrange a time for installation, picks up the materials from Carpetland, and completes the installation.

If the installer encounters unanticipated problems, such as the need to move heavy furniture or remove old flooring, he attempts to negotiate payment with the customer. The installer is free to do such additional work without charging the customer, but may insist on additional payment. If the installer and the customer do not reach an agreement, Carpetland might elect to absorb the cost. It is possible that the job would not go forward at all. Carpetland could not compel the installer to do the additional work without additional payment.

Carpetland does not provide any on-site supervision to the installers. When using a new installation service, a Carpetland representative may visit the work site to

observe the quality of the work, until the company is satisfied that the installer's work is up to its standards.

Carpetland does not limit the installers' other employment. They are free to accept contracts from others, including Carpetland's competitors. Carpetland provides no training and is not involved in the hiring, firing, or disciplining of the installers' employees. Carpetland does not control their days or hours of work or their vacation schedules. The installers provide their own tools and supplies; Carpetland provides only the carpeting and padding or other floor covering it has sold to the customer.

Checks are issued on a biweekly basis after the installer submits an invoice showing that the work was done. The amount is calculated on the fee per square yard that was negotiated between Carpetland and the individual installer. In 1991, the range was from $2.20 to $2.75 per square yard, with the average around $2.50. Carpetland charges the customers $3.00 per square yard for installation and makes a profit on each installation contract. No taxes are withheld. The installers are required to carry liability insurance and Carpetland demands documentation of coverage.

If a customer calls the Carpetland store with a complaint, the person who takes the call fills out a complaint form. The store first determines whether the complaint is related to the product it sold or to the installation. Installation problems might include a seam that is coming apart or a ripple in the carpeting. Carpetland determines which installer did the work and contacts him to make the necessary repair. A copy of the complaint form is provided to the installer, who sends it back to Carpetland with the customer's signature to document that the problem has been resolved to the customer's satisfaction.

Carpetland requires its installers to guarantee their work for one year, so if such a problem occurs within one

year of the original installation, the installer bears the expense of the repair. In the unusual circumstance that an installation problem appears later, Carpetland would pay an installer to make the repair.

Booth testified regarding written "retainage agreements" under which Carpetland retains a portion of the fees due to the installer until a fund of $1,000 is created. This money is used to defray the costs of repairs necessitated by improper installation. If an installer ceases doing business with Carpetland, the fund, including interest, is paid out in thirds, in 30-day increments, to allow for the possibility that a complaint may arise regarding one of the installer's last jobs. Not all installers agree, but Carpetland does prefer to have such an arrangement.

Booth explained that Carpetland also solicits work on a contract basis, in addition to its retail sales. Such a contract might involve floor coverings for a commercial building or new housing construction. When the bids on such a project include both materials and labor, the Carpetland salesperson solicits bids from several installers so that he may make his bid as low as possible. Thus, installers who regularly do work for Carpetland may bid against each other for these jobs.

According to Booth, neither measurers nor installers are identified in any way as Carpetland employees. They do not wear uniforms or other apparel with a Carpetland name or logo. They are not given Carpetland business cards to use. They use their own vehicles, which do not carry the Carpetland name.

### Contract for Installation Services

Carpetland uses two forms of standard contract. The first is a "Customer Sales Contract," which contains the "Installation by Subcontractor" provision quoted above. The second is an "Installation Subcontract," by which the customer authorizes Carpetland to arrange for installation of the floor covering. This document also contains

a "Contract for Installation Services" that is signed by
the installer and an authorized representative of Carpet-
land. The Contract for Installation Services identifies
Carpetland as contractor and the installer as subcontrac-
tor. The installer agrees to perform the services called for
by the contract at the time and place designated, in a
"neat, workmanlike manner in accordance with the job
specifications applicable to this Contract and established
trade practices." Carpetland agrees to furnish the carpet-
ing or floor covering; the installer agrees to provide all
other necessary tools and supplies. The installer guaran-
tees his work for one year and agrees to remedy any
defect in installation. Further, the contract states that
Carpetland will not pay for any additional services
requested by the customer unless Carpetland agrees in
advance to do so. The installer also agrees to obtain and
maintain liability insurance and to furnish certificates of
insurance to Carpetland. In addition to paying his own
state, federal, and local taxes, the "Subcontractor" also
agrees to "elect coverage under any applicable workmen's
compensation laws which provide for coverage pursuant
to election" and to "elect to operate or become subject to
any applicable unemployment compensation act which
permits such election." Finally, the contract is "personal"
to Carpetland and the installer, "and may not be assigned
or transferred by either party."

The parties agree that the appropriate standard of
review in this case is the "clearly erroneous" standard.
Nevertheless, the question arose at oral argument
whether, because the facts in this case are essentially
undisputed, the *de novo* standard should apply.

The Department states that in *City of Belvidere v. Il-
linois State Labor Relations Board*, 181 Ill. 2d 191, 205
(1998), this court departed from its prior holdings that
administrative rulings based on the application of law to

undisputed facts would be reviewed *de novo*. See, *e.g.*, *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271 (1996) (where facts are undisputed, an administrative determination of whether certain property is tax exempt answers a question of law, subject to *de novo* review). However, in *City of Belvidere*, we did not entirely abandon the *de novo* standard in administrative review cases.

"The standard of review applicable to an agency's decision depends upon whether the question presented is one of fact or law." *City of Belvidere*, 181 Ill. 2d at 204. When the decision involves a pure question of law, we will review it *de novo*. *City of Belvidere*, 181 Ill. 2d at 205. When reviewing purely factual findings, the agency's findings and conclusions are deemed to be *prima facie* true and correct and, thus, are reviewed under a manifest weight of the evidence standard. 735 ILCS 5/3—110 (West 2000); *City of Belvidere*, 181 Ill. 2d at 204.

Under some circumstances, however, the issue presented cannot be accurately characterized as either a pure question of fact or a pure question of law and, therefore, will be treated as a mixed question, subject to an intermediate standard of review. *City of Belvidere*, 181 Ill. 2d at 205. In *AFM*, we determined that whether certain workers are independent contractors under section 212 of the Act is such a mixed question of law and fact, subject to review for clear error. *AFM*, 198 Ill. 2d at 396. Under the clearly erroneous standard, we give somewhat less deference to the agency than we would if the decision related solely to a question of fact, because the decision is based on fact-finding that is inseparable from the application of law to fact. We will reverse only if, after review of the entire record, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

We note at the outset Carpetland's suggestion that the Department's summary of facts is "incomplete" and "misleading."

The Director's representative had at her disposal Carpetland's answers to Department questionnaires, the results of a Department audit of Carpetland, numerous documents, and the testimony summarized above. She prepared a detailed report, which contained findings of fact, analysis, and conclusions. She did not suggest that any of the witnesses were less than entirely credible. Carpetland filed objections to the report. Finding the objections untimely, the Director adopted the report as her decision. Upon remand from the circuit court, the Director responded to the objections and again affirmed the report and recommended decision of the representative.

A thorough review of the record reveals several misstatements of fact in the report. For example, the representative found that when Carpetland bid on commercial contracts, "installation was included." The record, however, shows that if a commercial job was to include installation, the Carpetland salesperson solicited bids from installers so that he could submit a bid covering both materials and labor.

The report also makes several references to individual mailboxes assigned to the installers and to the fact that installers would visit the Carpetland store to retrieve job assignments from the mailboxes. The testimony was clear, however, that only the Munster, Indiana, store utilized the mailbox system to communicate with installers. Thus, this practice is irrelevant to the present case.

The report also found that when a Carpetland store began to utilize the services of a new installer, the "work was checked closely" for the first several installations. In the testimony, however, the word "closely" was never used. The witnesses indicated that it was rare for

someone from Carpetland to visit an installation site. They might do so in the beginning of a working relationship with an installer, to observe the finished installation to see that it was up to standard.

The report states that "[w]hen work was unavailable from Carpetland[,] the installers worked for other carpet sales stores," creating the impression that their first duty was to Carpetland and that their willingness or ability to work for other stores was contingent on Carpetland's not having any work for them. The record discloses, however, that at least for some installers, Carpetland represented a small portion of their workload and that they had several clients who, in effect, competed for their time.

Similarly, the report states that all complaints about installation "flow through" Carpetland. Lawson, however, testified that he would leave one of his business cards with the customer, so that he could be contacted directly about any problems with the installation. Thus, communication through Carpetland was only one means by which a customer could make a complaint regarding installation.

The report also states that each installer was "required" to sign a written retainage agreement. However, the Carpetland executive who testified regarding these agreements said that Carpetland preferred to have this sort of arrangement with an installer, but did not necessarily refuse to do business with an installer who declined to participate in the retainage arrangement.

Finally, this section of the report contains legal conclusions, without reference to any supporting authority, in addition to findings of fact. For example, the report lists as a finding of fact the legal conclusion there was no privity of contract between the customer and the installer.

Because the report does not contain a complete and

reliable summary of the facts adduced at the hearing, we shall look to the record, as well as to the report, for the relevant underlying facts.

## APPLICATION OF SECTION 212

Carpetland clearly intended to deal with measurers and installers as independent contractors rather than employees, and organized its working relationships accordingly. However, our inquiry is not controlled by the designations or description used by the parties. 56 Ill. Adm. Code § 2732.200(b) (2001). Rather, we must examine their actual relationship, considering the incidents and circumstances surrounding the job classification. *Jack Bradley*, 146 Ill. 2d at 75-76. Thus, although the Carpetland sales contract and the installation contract are clear as to this intent, the contract language is informative, but not dispositive of the issue.

### Section 212(A)—Direction or Control

Under the Act, an independent contractor must be "free from control or direction over the performance" of the services he provides. 820 ILCS 405/212(A) (West 2000). " 'Direction or control' within the meaning of Section 212(A) of the Act means that an employing unit has the right to control and direct the worker, not only as to the work to be done but also how it should be done, whether or not that control is exercised." 56 Ill. Adm. Code § 2732.200(g) (2001).

In *Griffitts Construction Co. v. Department of Labor*, 76 Ill. 2d 99 (1979), we agreed with the Director that the construction company had not met its burden of demonstrating that a vice president and shareholder was an "outside salesman." Prior to that case, we last considered this issue in *Myers v. Cummins*, 9 Ill. 2d 582 (1956), in which we noted that the Act "does not contemplate that any control, however slight, will satisfy" this test. "The question is one of degree." *Myers*, 9 Ill. 2d at 588. *Myers*

involved taxi drivers. *Beth Weber, Inc. v. Murphy*, 389 Ill. 60 (1945), involved a seamstress who made alterations in a dress shop. Although the alteration work was a "necessary adjunct" (*Beth Weber*, 389 Ill. at 66) of the shop owner's business, the only control she exerted over the seamstress was a no smoking policy and the imposition of "certain standards of conduct" (*Beth Weber*, 389 Ill. at 63-64). Because the shop owner "was interested only in the result of the work accomplished" by the seamstress, and "not the means selected by her," we concluded that the seamstress was an independent contractor. *Beth Weber*, 389 Ill. at 66. None of the prior decisions in which this court has considered this issue is particularly illuminating of the facts in the present case.

The appellate court has considered the direction and control issue in a case with facts quite similar to the present one. In *Cohen Furniture Co. v. Department of Employment Security*, 307 Ill. App. 3d 978 (1999), the appellate court agreed with the Director's determination that carpet installers were not independent contractors, based on the direction and control test of section 212(A).

Carpetland argues that this case is factually distinguishable from *Cohen Furniture*. First, Cohen Furniture's advertised price for carpeting sometimes included the cost of installation (*Cohen Furniture*, 307 Ill. App. 3d at 980), while Carpetland was careful to inform its customers that it did not provide installation. As in the present case, however, when a customer wanted installation services, Cohen Furniture would contact an installer about performing the work and might arrange a convenient time. The installer would pick up the carpeting and padding from the warehouse and take it to the customer's location for installation. After completing the work, the installer would return the work order, "itemizing the labor and material charges according to Cohen's standard fee list." *Cohen Furniture*, 307 Ill. App. 3d at 983. Car-

petland, in contrast, negotiated a rate with each installer, which was not necessarily the same for each job, and did not impose a standard fee scale for labor and materials.

In addition, Cohen Furniture's installers worked "three to four days per week" and were paid on a weekly basis (*Cohen Furniture*, 307 Ill. App. 3d at 983), while the installers and measurers in the present case may do work for Carpetland as frequently as every day or as infrequently as once a month. They are not on a regular pay cycle, but are paid upon submission of invoices.

In *Cohen Furniture*, the installers were permanent employees, based on the fact that they signed a single contract at the beginning of the working relationship. *Cohen Furniture*, 307 Ill. App. 3d at 983. The installers in the present case sign a contract for each individual job that they accept from Carpetland.

As in the present case, Cohen Furniture demanded a one-year guarantee from its installers and handled customer complaints, but Cohen would "decide[ ] if the problem [was to] be remedied by repair or reinstallation and if the original installer [was] obligated to pay for the corrections." *Cohen Furniture*, 307 Ill. App. 3d at 983. This demonstrates slightly more control over the complaint process than Carpetland exercises.

Because the facts of the present case are unlike those in *Cohen Furniture* in significant respects, we are not persuaded by the holding in that case. Thus, we will examine the report and the Director's decision in light of the relevant factors.

The Administrative Code contains a list of 25 factors that the Department "will examine" to determine whether direction or control exist. 56 Ill. Adm. Code § 2732.200(g) (2001). These factors will be considered in light of the "type of business subject to review and the relationship being examined" (56 Ill. Adm. Code § 2732.200(g) (2001)). Thus, not all factors will be

relevant in every case. In addition, the result will be determined by "the business reality or totality of circumstances," not by the answer to any particular question or group of questions. 56 Ill. Adm. Code § 2732.200(g) (2001).

Carpetland successfully argued to the appellate court that the representative, the Director, and the trial court had ignored the 25 factors. The report did not specifically refer to the section 2732.200(g) factors, but the Director noted in her decision that all of the factors used by her representative were relevant and are found in section 2732.200(g), although no attempt was made to examine the 25 factors one by one. The appellate court did consider each of the 25 factors individually and concluded: "By our count, no less than 24 of the 25 factors set out by the Department in its regulations suggest that Carpetland does not 'control' the installers and measurers." *Carpetland*, 319 Ill. App. 3d at 1077.

The first factor is whether the employing unit issues assignments, schedules work, and sets quotas or time requirements. 56 Ill. Adm. Code § 2732.200(g)(1) (2001). The report stated that Carpetland "provided assignments, [and] established dates for installation." Further, Carpetland, "established with the customer the day and approximate time at which the installer had to report to the customer's home, while allowing the installer to determine the exact time with the customer." The measurers "received the assignment on one day, did the measuring the next, and by the morning of the third day, had to have the diagram with the measurements at Carpetland's store." Based on these findings, the Director concluded that Carpetland "had the ultimate authority in deciding which installer or measurer would perform which job."

We agree with the appellate court that the record does not support a finding that Carpetland issued assign-

ments, scheduled work, or set quotas or time requirements for the installers or measurers. *Carpetland*, 319 Ill. App. 3d at 1077. Carpetland did not issue assignments; rather, it contacted the installers and measurers to offer them assignments on a job-by-job basis. The installers and measurers were free to decline any job, for any reason, and the record shows that it was not unusual for them to do so. An employee, on the other hand, who was assigned a specific task and refused to perform that task would most likely be discharged for cause. An installer who repeatedly declined work for Carpetland customers might, over time, receive fewer calls from Carpetland. This is not tantamount to firing. It is a function of supply and demand. Similarly, Carpetland did not "schedule work"; rather, it contacted installers or measurers with a request for their services on a particular day, because that was when the services were needed. No quotas were imposed by Carpetland and no time requirements set. The more efficiently the installers and measurers worked, the greater their earnings.

The second factor, whether the employing unit may change the methods used by the worker in performing his services, also favors a finding that these workers were independent contractors. 56 Ill. Adm. Code § 2732.200(g)(2) (2001). Neither the report nor the Director's decision suggested otherwise.

The only "routine or schedule" set by Carpetland (56 Ill. Adm. Code § 2732.200(g)(3) (2001)) involved the turning in of completed work orders in advance of payment. The workers were not required to "report to a specific location," such as a Carpetland store, or to report at "regular intervals." 56 Ill. Adm. Code § 2732.200(g)(4) (2001). The mailboxes referred to in the report, from which some installers picked up paperwork, are irrelevant. None of the Carpetland stores in Illinois utilized this system of communicating with installers. Installers

did pick up the carpeting or other floor covering at Carpetland stores or directly from a supplier, but this does not constitute "reporting" to the employing unit. "Reporting" implies that one's presence is required. The record reveals that an installer could have sent anyone to pick up a roll of carpeting; and a measurer need never set foot in a Carpetland store.

Factors five and six are not met. Carpetland did not require measurers and installers to furnish a record of their time (56 Ill. Adm. Code § 2732.200(g)(5) (2001)), and did not require them to work a specific number of hours per day or per week (56 Ill. Adm. Code § 2732.200(g)(6) (2001)). These workers reported to Carpetland the fact that a job was done, not the time it took to complete it. When Carpetland had work to offer, they could work as many or as few hours as they were willing. The fact that they might, in the words of the report, "strive to make themselves available for any and all work assignments" does not indicate direction or control. It indicates ambition.

Notwithstanding the report's observation that one of the installers had been doing work for Carpetland for over 20 years, none of the workers were engaged by Carpetland "on a permanent basis." 56 Ill. Adm. Code § 2732.200(g)(7) (2001). Even after a 20-year working relationship, Lawson would contact Carpetland when he had time available to see if there were any jobs coming up. At other times, a Carpetland salesperson would contact him. This relationship, although long-term, was not permanent. Carpetland's arrangement with the measurers was no more permanent.

Carpetland did not reimburse the installers or measurers for expenses incurred (56 Ill. Adm. Code § 2732.200(g)(8) (2001)), such as mileage, parking, stationery and office supplies, tools, or materials. If a job required additional travel, the installer or measurer could

impose an additional charge to recoup the expense. When a job required paying for parking, the installer could build this expense into his bid. While an employee might submit receipts to be reimbursed for such expenses, these workers were able to pass these costs through to Carpetland to recover their costs and guard their profits.

Factors 9 through 13 are not met. These workers were not eligible for pensions or other benefits given to Carpetland employees (56 Ill. Adm. Code § 2732.200(g)(9) (2001)); Carpetland did not carry workers' compensation insurance on them (56 Ill. Adm. Code § 2732.200(g)(10) (2001)); Carpetland did not make social security or other tax deductions from their compensation (56 Ill. Adm. Code § 2732.200(g)(11) (2001)); Carpetland did not report the workers' income to the IRS on Form W-2 (56 Ill. Adm. Code § 2732.200(g)(12) (2001)); and Carpetland did not bond the installers or measurers (56 Ill. Adm. Code § 2732.200(g)(13) (2001)).

Factor 14 deals with whether the employing unit furnishes the worker with materials and supplies, tools or equipment. 56 Ill. Adm. Code § 2732.200(g)(14) (2001). The report states that Carpetland furnished the materials to be installed, while the installers provided only "minor materials." Even if Carpetland is furnishing "materials" to the installers, it is not furnishing "supplies, tools, or equipment." Thus this factor does not necessarily weigh in favor of finding the installers to be under the direction or control of Carpetland. Because the measurers' work does not require "materials," and because their supplies, tools, and equipment are not provided by Carpetland, this factor does not apply to them either. By the same token, factor 15, whether the employing unit furnishes "transportation, samples, a drawing account, business cards, an expense account, or order blanks" (56 Ill. Adm. Code § 2732.200(g)(15) (2001)), does not apply to installers or measurers.

Both installers and measurers are free to engage in other employment, including work for competing floor-covering retailers, and several testified that they did so on a regular basis. 56 Ill. Adm. Code § 2732.200(g)(16) (2001). Carpetland did not restrict these workers in terms and conditions of sale or choice of customers. 56 Ill. Adm. Code § 2732.200(g)(17) (2001). Indeed, if an installer determined that additional work would be required to prepare the subsurface prior to installation, he would quote the additional price to the customer and reach an agreement. Thus, the installers were able to alter the terms and conditions of the installation agreement arranged by Carpetland. The record indicates that such additional charges might be paid directly to the installer or remitted through Carpetland.

Carpetland did not "assign or limit" the territory in which the installers or measurers worked. 56 Ill. Adm. Code § 2732.200(g)(18) (2001). In fact, an installer or measurer might decline a particular job if it was outside of the area in which he wished to work, or he might demand payment for additional travel time.

Factor 19 involves the setting of prices and credit terms for the product or service. 56 Ill. Adm. Code § 2732.200(g)(19) (2001). The report states that "Carpetland set all prices" and that the installers "were in no position to bargain." Despite testimony that the installers negotiated their rates with Carpetland, the report concluded that:

> "If Carpetland offered $2.20 per square yard for starters, the individual installer either accepted or kept beating the pavement going to other carpet stores, which, aware of the market conditions, would either have no work or make him a similar offer. Meanwhile[,] Carpetland kept charging its customers an installation fee of $3.00 per yard."

Carpetland did set a ceiling on the price it was willing to pay installers. Presumably, the price to the customer of $3 per yard for installation was consistent

with the prevailing market. Carpetland was entitled to recover from the customer not only the amount it actually paid the installers, but also to recover any transaction costs. Carpetland was also within its rights to try to keep its costs as far below $3 as possible, and to make a profit on the difference.

Carpetland, however, did not "set" the price it paid installers. The installers were paid between $2.20 and $2.75 per square yard. The exact amount was the result of negotiation between Carpetland and the individual installer. An installer with more experience and a good track record, who was responsive to Carpetland's offers of jobs, was likely to negotiate a rate at the upper end of this range. In addition, the installers who testified did not suggest that they ever had to "beat the pavement" looking for work. In fact, they described occasionally having to decline jobs because their schedules were full. Although these witnesses were likely among the most successful installers, their experience with Carpetland suggests two business entities negotiating a deal that was beneficial and profitable to both, rather than the "adhesion contract" alluded to in the report.

The report also finds it significant that the installer might collect C.O.D. payable amounts from the customer and concludes that "[i]f the installer had been functioning as an independent business, it is unlikely that he would accept a check made out to an [sic] different business as payment for services he, himself, performed." It was clearly erroneous to attach such significance to the installer's receipt of a C.O.D. payment on Carpetland's behalf. An installer could be doing jobs for Carpetland and another store on the same day, have materials from both retailers in his truck, and receive C.O.D. payments for both. His doing so merely facilitated his own prompt payment.

The measurers were paid a flat rate per measure.

The record does not reveal what amount Carpetland charged its customers for this service, but the measurers had no role in setting this price. This factor, therefore, may weigh slightly in favor of the measurers being seen as employees.

Carpetland did not "reserve the right to approve orders or contracts." 56 Ill. Adm. Code § 2732.200(g)(20) (2001). Both measurers and installers were free to accept additional business directly from customers, without seeking approval from Carpetland. For example, if a customer wanted an additional room measured, perhaps anticipating another carpet purchase, Carpetland had no interest in whether a measurer accepted payment for providing the additional service. Similarly, if a customer purchased tile or carpeting from a discount store or directly from a mill and offered the installer additional work, Carpetland had no right to approve, or even to be informed of, such an arrangement.

Factors 22 through 24 do not evince an employment relationship. The installers and measurers were not required to attend meetings or training (56 Ill. Adm. Code § 2732.200(g)(22) (2001)); Carpetland did not appoint their supervisors, if indeed they were supervised by anyone else (56 Ill. Adm. Code § 2732.200(g)(23) (2001)); and Carpetland did not have the right to set rules and regulations (56 Ill. Adm. Code § 2732.200(g)(24) (2001)). The report attaches some significance to the fact that Carpetland prohibited the installers from disconnecting or connecting any gas or water lines. This, however, is merely a sensible attempt by a business to limit the likelihood that a customer may suffer some harm due to negligence and seek redress. In other words, a contractor who limits the work that it is subcontracting to certain tasks, so as to exclude tasks that might give rise to liability, is not making rules or imposing regulations on the work that is the subject of the contract.

Factors 21 and 25 are the most contested issues. Factor 21 asks if the employing unit has the right to discharge the worker. 56 Ill. Adm. Code § 2732.200(g)(21) (2001). The report states that if Carpetland "chose not to call a certain installer or measurer for a job, that installer or measurer did not work." The report also states that the "right to discharge is the ultimate right to control" and then concludes that Carpetland's decision to discontinue "assigning jobs" to a worker who "has been regularly receiving and accepting assignments" is "tantamount to a discharge." Carpetland, in contrast, argues that ceasing to do business with an installer or any other business entity is not a discharge.

We agree with Carpetland. Although an installer or measurer might find himself out of business if Carpetland terminates their business arrangement, this does not constitute a discharge. It is a result of becoming too dependent on one customer. The measurers and installers who maintain working relationships with other retailers and who solicit business on their own are more likely to survive if Carpetland takes its business elsewhere.

The final factor is whether the employing unit purports to guarantee the product or service performed. 56 Ill. Adm. Code § 2732.200(g)(25) (2001). As the Director noted in her decision, "Carpetland guaranteed the workmanship of the installation. *** [T]he customer would look to Carpetland to rectify any problems with the floor covering or installation. *** Carpetland remained ultimately responsible for the satisfaction of the customer." This conclusion is supported, according to the decision, by Carpetland's requirement that installers remedy problems or reimburse Carpetland for repairs that it had to provide.

On the other hand, each installer was required by Carpetland to guarantee his work for one year. That guarantee could be enforced by the customer's contact-

ing the installer directly (one installer testified that he left his business card for this purpose), or by contacting the installer through Carpetland. The appellate court noted that "[t]his factor favors finding that Carpetland was not, in reality, the guarantor of the work performed by the installers because *** the installers were fully underwriting the guarantees made to the customer. *** The primary risk that a customer might be unhappy with the installation was therefore borne by the installer, not Carpetland." 319 Ill. App. 3d at 1077. The "business reality" of this arrangement (56 Ill. Adm. Code § 2732.200(g) (2001)) is that Carpetland simply wanted to insure that its customers were well-served and that if a customer did have a complaint about installation, it was resolved without additional expense to Carpetland.

As for the measurers, the record does not suggest that Carpetland in any way guaranteed to the customer that the measurer's work was accurate. Rather, the measurer guaranteed the accuracy of his work to Carpetland. If a measurer made an error, he would remeasure for no additional cost. If the error resulted in a loss to Carpetland, as, for example, when a piece of carpet was cut to the wrong size and could not be used on the particular job, the measurer was held responsible for the loss.

After examination of the 25 factors and the record, we are left with the " 'definite and firm conviction' " (*AFM*, 198 Ill. 2d at 395, quoting *United States Gypsum Co.*, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542) that the Director's conclusion on this factor, as to both measurers and installers, was incorrect.

### Section 212(B)—Outside the Usual Course of Business or Place of Business

"The two factors in Section 212(B) are in the alternative. Section 212(B) is satisfied if the service is either outside the usual course of business of the employing

unit or performed outside of all the places of business of the employing unit." 56 Ill. Adm. Code § 2732.200(f) (2001).

With regard to carpet installation and the "usual course of business" factor, the report states:

> "The business of the petitioner is to sell floor coverings with installation. The installers services are an integral part of the petitioner's business. But for the services provided by the installers and[,] to [a] great extent, by the measurers, petitioner would have difficulty attracting customers and ultimately would have no business."

The Director's decision notes testimony that 75% of Carpetland's sales involved installation and concludes that because "it is apparent that the majority of petitioner's business involves the sale of carpeting which is installed *** installation is in the petitioner's usual course of business." The appellate court did not address this factor.

This court has rarely addressed the "usual course of business" provision of section 212(B). In *Toplis & Harding, Inc. v. Murphy*, 384 Ill. 463, 477 (1943), we concluded that an insurance claims adjuster was performing services in the usual course of business for an insurance company when he performed tasks identical to those performed by full-time employees. In *Murphy v. Daumit*, 387 Ill. 406, 417 (1944), we determined that the services of door-to-door vacuum cleaner salesmen were in the usual course of business for the distributor of the machines, based on two key facts: the distributor's "profits were almost entirely from the sales made" by the salesmen, and the "entire office staff consisted of persons whose employment stemmed out of the services of the salesmen." Later, in *Eutectic Welding Alloys Corp. v. Rauch*, 1 Ill. 2d 328 (1953), we determined that the services of "field engineers" who called on metal fabricators to take orders for a company that manufactured and sold welding rods and fluxes were part of the company's

usual course of business. In none of these cases has this court sought to formulate any sort of rule or principle to be applied to determine whether services are provided in the usual course of the employing unit's business.

The appellate court has addressed this issue more recently. *Hart v. Johnson*, 68 Ill. App. 3d 968, 976 (1979), also involved dealers who sold vacuum cleaners for a distributor. *Richardson Brothers v. Board of Review of the Department of Employment Security*, 198 Ill. App. 3d 422, 430 (1990), involved workers who sold and distributed bedding and garden plants for a grower and distributor. *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108, 113 (1992), involved chauffeurs who performed driving services for a dispatching service. Finally, *United Delivery Service, Ltd. v Didrickson*, 276 Ill. App. 3d 584, 588-89 (1995), involved drivers for a package delivery service. In all four cases, the appellate court found that the worker was engaging in the usual course of business of the employing unit. None of these cases offers a rule or principle for discerning the "usual course of business."

Carpetland suggests that these cases, taken together, stand for the proposition that an individual is providing services in the usual course of business only when "the sole business of the alleged employer is the same" as the services provided by the worker. This goes too far. Not only can one easily imagine a service provided in the usual course of business that is not the "sole" or even the major business of the alleged employer, the Act must also be read liberally in favor of inclusion of workers. *Jack Bradley*, 146 Ill. 2d at 75.

Many years ago, however, this court did offer some guidance on this issue. In *Schatz, Pollack Woolen Co. v. Murphy*, 384 Ill. 218, 221 (1943), we found that the washing of windows "was not within the usual course of appellee's business in selling woolens to the tailoring trade.

His services may have rendered the place of business more pleasant but they did not enter into any of the many activities *necessary* to the purchase of woolens and the resale of them to tailors." (Emphasis added.) Thus, when considering the usual course of the business of the employing unit, the focus should not be on whether the services are provided habitually, customarily, or routinely. Rather, the key to this inquiry is whether the services are necessary to the business of the employing unit or merely incidental. This is consistent with the guidance given in the Administrative Code that services "not necessary to the employing unit's business" are outside the usual course of business. 56 Ill. Adm. Code § 2732.200(f)(1) (2001).

The washing of windows or mowing of grass for a business is incidental. But when one is in the business of selling a product, sales calls made by sales representatives are in the usual course of business because sales calls are necessary. See *Murphy*, 387 Ill. at 417. When one is in the business of dispatching limousines, the services of chauffeurs are provided in the usual course of business because the act of driving is necessary to the business. See *O'Hare-Midway Limousine Service, Inc.*, 232 Ill. App. 3d at 113.

The report concluded that installation is necessary to Carpetland's continued survival, yet the testimony indicated that a customer could locate a carpet installer in the yellow pages to install carpeting purchased from a business that does not provide installation services, such as a discount home improvement store or a carpet mill that sells directly to the public. There is no basis in the record for the report's conclusion that "but for" the availability of installation services, Carpetland would have gone out of business.

Carpetland has chosen to expressly limit its business to the retail sale of floor coverings. Its prices do not

include installation. The sales agreement clearly states that installation must be arranged separately. Carpetland's willingness to accommodate the customer by arranging for installation with an installer that Carpetland can vouch for is a convenience to the customer. That Carpetland may enjoy a competitive advantage because of its ability to arrange for installation by independent installers does not make installation a part of its usual course of business. That three-quarters of Carpetland's customers opt for this service is evidence that this is a successful business strategy.

We are, thus, left with the " 'definite and firm conviction' " (*AFM*, 198 Ill. 2d at 395, quoting *United States Gypsum Co.*, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542) that the conclusions regarding carpet installation and Carpetland's usual course of business in the report and the Director's decision are erroneous. As to the installers, Carpetland has met its burden under section 212(B).

The situation with the measurers is not as clear-cut. The report concludes that:

"Without accurate measurements, petitioner would have a difficult time finalizing its sales to the customers. The sales persons could and were encouraged to do the measurement, by making them pay half of the measurer's fees, but such demands on their time would reduce the volume of their sales. *** Thus, the measurer's services were integrated into the petitioner's business and therefore were clearly within the usual course of, and in furtherance of the petitioner's business."

The Director concurred, noting that "the petitioner's salespeople, who are employees, can and often do the measuring themselves." The appellate court did not consider this factor.

Calculating the price of goods is necessary to Carpetland's business. The salesperson cannot close the deal until he can multiply the square yardage of carpeting required by the price per square yard. The customer may

provide the dimensions, in which case no measurement is needed. If not, it is the salesperson's responsibility to obtain the needed information. When one's employee is assigned the responsibility for a certain task, and has the choice between performing that task himself or delegating it to another, that task is clearly within the course of business for the employer. Thus, the measurers do perform a service within Carpetland's usual course of business.

Because the section 212(B) factors are in the alternative, the measurers do not meet this section unless their services are performed outside all of Carpetland's places of business. The determinative issue is whether the location being measured is a place of business for Carpetland.

As to this issue, the report stated that measuring "could be performed nowhere else but at the customer's premises." The report also notes that "where an employer assigns a specific area for the purpose of selling its product or representing its interest, that area is the place of business of the enterprise," quoting *Richardson Brothers v. Board of Review of the Department of Employment Security*, 198 Ill. App. 3d 422, 430 (1990), and also citing *Eutectic Welding Alloys Corp. v. Rauch*, 1 Ill. 2d 328 (1953), and *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108 (1992). The Director's decision states that the measurers "were assigned to a specific area[,] i.e., the customer's home. They represented the petitioner's interest in that customer's home. The customer's home was the place of business of the petitioner." The Director concluded that Carpetland's interest did not end when it gave the job to the measurer because, if the measurer made an error, Carpetland would bear the cost, which it would attempt to recover from the measurer.

The appellate court disagreed, finding that the

measurers were not representing Carpetland while at the customer's premises, based primarily on the language of the sales agreement. However, although the sales agreement does inform the customer that installation is available through a "subcontractor," it does not mention the measuring service. Thus, we must look further than the sales agreement to determine whether a customer's premises is "outside of all the places of business of the enterprise for which such service is performed." 820 ILCS 405/212(B) (West 2000).

The Department offers three rationales for finding that the customer's premises should be considered Carpetland's place of business. First, the Department asserts that the place of business extends to "any place where a worker performs agreed-upon services" for an employing unit. Second, the Department claims that "even brief appearances by a worker at an employer's office are sufficient to establish that the worker performs services at the employer's place of business." And third, the Department asserts that the place of business extends to "any location where workers regularly represent an employer's interest."

We reject the first two rationales, but accept the third. As for the first, if this were the test for place of business, the exception for independent contractors would cease to have any meaning because any place in which a worker performed an agreed-upon service, even his own home or office, would become the place of business of the party who hired him.

As for the second rationale, the cases cited by the Department do not support its contention that "even brief appearances" at the employer's office are sufficient, standing alone, to establish that services are provided at the employing unit's place of business. In *Rozran v. Durkin*, 381 Ill. 97, 104-05 (1942), the delivery driver made more than "brief appearances" at the delivery service.

He reported there "each and every day, received his instructions from the dispatcher, secured the load for his truck on the premises, [and] returned his collections and his moneys on C.O.D. packages to the office." In any event, the place of business in this case would also have included the delivery route itself (see *United Delivery Service*, 276 Ill. App. 3d at 588-89). This case, thus, does not stand for the proposition that "even brief appearances" at the employer's offices, by themselves, are sufficient to defeat this factor.

The Department's reliance on *Toplis* is similarly flawed. We concluded in that case that "[t]he record conclusively show[ed] that the services performed were all within the usual course of business of appellant and that some of them were performed in appellant's regular place of business." *Toplis*, 384 Ill. at 477-78. We did not attach the significance to "brief appearances" that the Department now urges; rather, this case was decided primarily on the basis of the "usual course of business" provision of section 212(B).

Finally, the Department states that in *Hart* the employer could not satisfy this condition "despite the fact that the workers there only reported to the employer's office to pick up contract forms and receive phone messages." This is a significant misstatement of the facts. The appellate court said in *Hart* that the services of the vacuum cleaner salesmen were not performed outside Hart's place of business because "[d]ealers can attend morning sales meetings at Hart's office and can obtain leads, door hangers, installment contract forms and credit applications there. More importantly, the dealers use the staff of Hart's office to assist in the performance of their duties by relaying phone messages from the public to the dealers." *Hart*, 68 Ill. App. 3d at 976. Thus, despite the brevity of the salesmen's appearances at the office, the work-related nature of these appearances

defeated the employing unit's claim that the salesmen's work was conducted outside the usual place of business.

In its reply brief, the Department offers a third rationale, that the employing unit's place of business extends to any location where workers regularly represent its interest. We applied this reasoning in *Eutectic Welding Alloys*, 1 Ill. 2d at 341, in which we held that "[w]here the employing unit assigns a specific area to an individual for the purpose of selling its product or representing its interest, that area is the place of business of the enterprise." The Administrative Code echoes this point: "Any territory in which a salesman represents his employing unit's interests is the employing unit's place of business." 56 Ill. Adm. Code § 2732.200(f)(2)(B) (2001).

In past cases, this rationale has been utilized when a worker is assigned to a specific geographic area, such as a sales territory or delivery route. Carpetland does not assign a specific territory to its salespeople or to individual measurers. Nevertheless, when a Carpetland salesperson visits a customer's premises to obtain measurements necessary for the quoting of a price and the closing of a sale, he is "representing his employing unit's interest." So, too, is a measurer to whom the salesperson might delegate this task. As a result, the premises being measured are Carpetland's place of business for purposes of section 212(B). We, therefore, conclude that because the measurers are representing Carpetland's interest when they visit a customer's premises to take measurements, they are providing services at Carpetland's place of business. Because section 212(B) is not met, the measurers are not independent contractors. We, thus, reverse the appellate court and affirm the decision of the Director as to the status of measurers.

### Section 212(C)—Independently Established Trade, Profession, or Business

Noting that the parties' characterization of their relationship does not control, the report of the Director's representative states three bases for its conclusion that the installers were not engaged in an independently established trade, profession, or business. First, the report concludes that "the installers had no financial interest in any business, and if denied assignments by the petitioner they would be unemployed." They were "dependent upon Carpetland getting the customers." Second, the report attaches great significance to the fact that 22 of 259 installers filed claims for unemployment benefits during the relevant time period. "An individual who files a claim for unemployment is usually not an individual engaged in an independently established business, and is usually not an individual who believes himself to be an independently established business person." Third, the report states that the fact that some of the installers worked for others as employees "is indicative that they were looking for regular employment, and were not independent contractors as the petitioner claims."

The Director affirmed these conclusions, adding that no evidence showed "that the installers found employment through their own efforts. If the petitioner did not sell the carpet and arrange for the worker to install it, the worker would have been unemployed or found employment with another carpet retailer under the same circumstances. Thus, though the installers may have had tools and business listings, they had no proprietary interest in a business to sell or give away." The Director also stated that, although not a deciding factor, the facts that some of the installers filed claims for unemployment benefits and some worked for others as employees were indications that the installers were not engaged in

independently established trades, occupations, or businesses.

We first address the notion, suggested by the Director and argued by the Department in its brief, that the fact that 22 installers have filed claims for unemployment benefits supports a finding that they were not independent contractors. While a number of claims is certainly cause for the Department to initiate an audit of an employing unit, this fact is irrelevant to the section 212 inquiry. We, therefore, find any reliance on this fact to constitute clear error.

Turning to the question of whether an installer is engaged in an independently established trade, occupation, or business, we consider the guidance offered by the Administrative Code, which states that a worker is independently established if he or she "has a proprietary interest in the business which he can sell, give away or operate without hindrance from any other party." 56 Ill. Adm. Code § 2732.200(e) (2001). As we have noted before, this requires that the individual's "entrepreneurial enterprise must enjoy a 'degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services.' " *AFM*, 198 Ill. 2d at 401, quoting *Jack Bradley*, 146 Ill. 2d at 78. The Administrative Code suggests 13 factors, no one of which is dispositive, for consideration. The inquiry focuses on "the business reality or totality of circumstances." 56 Ill. Adm. Code § 2732.200(e) (2001). The appellate court considered these factors and found the evidence "overwhelming" that the installers met the requirement of section 212(C). *Carpetland*, 319 Ill. App. 3d at 1079.

The witnesses stated that Carpetland provided between 25% and 75% of their workload. They also testified that they, at times, declined Carpetland jobs because they were too busy. The Department argues that the

installers could not have survived the termination of their working relationship with Carpetland. Losing three-quarters, or even one-quarter, of one's business would likely threaten the survival of any business. Indeed, some of the installers' businesses apparently did not survive as independent entities without having Carpetland as a client. The inquiry, however, is not whether the purported independently operated business *did* survive. The question is whether it *could have* survived. Just because a business relies too heavily on one customer, to the point that its survival is threatened if it loses that account, does not mean that it is not independently established. Thus, we will look to the factors listed in the Administrative Code to determine whether an installer doing work for Carpetland under the terms of their written agreement had a business that he could "sell, give away, or operate without hindrance." 56 Ill. Adm. Code § 2732.200(e) (2001).

We have already alluded to the first factor. The installer's interest in his business "is not subject to cancellation or destruction upon severance of the relationship" with Carpetland. 56 Ill. Adm. Code § 2732.200(e)(1) (2001). He might be under increased pressure to find other clients or to advertise his business to the general public, but Carpetland's severance of their relationship would not necessarily destroy his business. The installers invested substantial amounts in equipment and in maintaining an inventory of supplies. The installers who testified each owned one or more vehicles dedicated to the business. Every installer must own or have access to at least one vehicle, for they must haul and deliver carpeting and other materials. 56 Ill. Adm. Code § 2732.200(e)(2) (2001). The installers stood to make a profit or suffer a loss based on the efficiency and quality of their work. 56 Ill. Adm. Code § 2732.200(e)(3) (2001). They made their "services available to the general

public or the business community on a continuing basis" ·
(56 Ill. Adm. Code §§ 2732.200(e)(4), (e)(12) (2001)) and
by the use of business cards, yellow pages advertising,
ads in church and school bulletins and programs, and
through word of mouth. The witnesses testified to doing
business with Carpetland under an assumed business
name. Others may have used their individual names as
sole proprietors of their carpet installation business. This
factor does not weigh against finding them independent
contractors. 56 Ill. Adm. Code § 2732.200(e)(6) (2001).
The installers who testified not only had shops or offices
of their own, one had his own warehouse facility. 56 Ill.
Adm. Code § 2732.200(e)(7) (2001). Even installers whose
businesses were much smaller than these witnesses had,
at the very least, some freestanding location for the stor-
age of a vehicle and supplies. Carpetland not only did not
represent the installers as its employees, it actively
endeavored to inform customers that the installers were
not employees. 56 Ill. Adm. Code § 2732.200(e)(8) (2001).
The installers could, and did, hire additional workers,
without notice to Carpetland, and were responsible for
reporting and paying taxes on their wages. 56 Ill. Adm.
Code § 2732.200(e)(11) (2001). The installers also had
the right to work for others, including Carpetland's
competitors, whenever and on whatever basis they chose.
56 Ill. Adm. Code § 2732.200(e)(12) (2001). The three
who testified exercised this right frequently. That others
may not have done so does not diminish the right they
retained. Similarly, some installers maintained business
listings; others apparently did not. 56 Ill. Adm. Code
§ 2732.200(e)(12) (2001). (Factor 13, which relates to
professional licensure, is not applicable. 56 Ill. Adm. Code
§ 2732.200(e)(13) (2001).)

Factors 5 and 10 are not as clear-cut. It was undoubt-
edly Carpetland's intention that the installers file tax
returns as independent business entities (56 Ill. Adm.

Code § 2732.200(e)(5) (2001)) and otherwise be responsible for other expenses such as unemployment insurance (56 Ill. Adm. Code § 2732.200(e)(10) (2001)), but as the report noted, not all installers complied with these business formalities. The appellate court concluded that the fact that some installers:

> "failed to keep accurate records and diligently report to the Department is manifestly insufficient to make them employees of Carpetland. Poor record keeping and negligent reporting, in and of themselves, are inadequate to transform employment status from that of an independent contractor to an employee." 319 Ill. App. 3d at 1079.

We agree. The installers were engaged in an independently established business or trade. Carpetland, thus, meets the requirement of section 212(C) with regard to the installers.

In sum, the Director's determination that the installers are not independent contractors is clearly erroneous. The Director's determination regarding measurers is affirmed.

## CONSTITUTIONAL QUESTION

Carpetland argued before the circuit court and the appellate court that the actions of the Director violated the due process clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2), because the Director had "a direct, proximate, and definite pecuniary interest in the outcome of the proceeding." The Department claims that this issue is waived for failure to raise it in the administrative proceeding. Carpetland responds that questions of law, in general, and questions of constitutionality, in particular, will not be considered waived if raised for the first time before the circuit court. In any event, Carpetland asserts, this court may exercise its discretion and choose to address the constitutional question notwithstanding any waiver.

As a general rule, issues or defenses not raised before

the administrative agency will not be considered for the first time on administrative review. See 735 ILCS 5/3—110 (West 2000); *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278 (1998). A party's right to question the validity of a statute is, therefore, subject to waiver. It is also true, however, that an administrative agency lacks the authority to invalidate a statute on constitutional grounds or to question its validity. *Texaco-Cities Service*, 182 Ill. 2d at 278. "Nonetheless, it is advisable to assert a constitutional challenge on the record before the administrative tribunal, because administrative review is confined to the proof offered before the agency. Such a practice serves the purpose of avoiding piecemeal litigation and, more importantly, allowing opposing parties a full opportunity to present evidence to refute the constitutional challenge." *Texaco-Cities Service*, 182 Ill. 2d at 278-79.

Although we recognize that waiver is a limitation on the parties rather than on this court's jurisdiction, and that the doctrine of waiver may be relaxed when necessary to maintain a uniform body of precedent, or where the interests of justice so require (*American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 480 (1991)), this is not such a case. If this court is to consider any possible conflict of interest that might render the Director's actions in such cases constitutionally suspect, the Director should first be given the opportunity to build a record in response to the constitutional challenge.

Carpetland's constitutional claim is waived for failure to raise it at the first opportunity, during the agency proceeding, and we decline to reach it.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part, the judgment of the circuit court is affirmed in part and

reversed in part, and the decision of the Department is confirmed in part and set aside in part.

*Appellate court judgment affirmed*
*in part and reversed in part;*
*circuit court judgment affirmed*
*in part and reversed in part;*
*Department decision confirmed*
*in part and set aside in part.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

I agree with the court that the Department's determination that the carpet measurers are not independent contractors must be affirmed (201 Ill. 2d at 396). However, I disagree with the court's conclusion that the Department's determination concerning the carpet installers is clearly erroneous (201 Ill. 2d at 396), and therefore must respectfully dissent from that portion of today's opinion.

The Illinois Unemployment Compensation Act (Act) requires all employers to make contributions to a fund based upon "wages payable for employment." 820 ILCS 405/1400 (West 2000). The fund is used to provide money to involuntarily unemployed workers to help ease the financial hardships caused by unemployment. This court has consistently viewed the Act not as a taxing act, but rather as legislation designed to relieve the burdens of unemployment by utilizing the state's police powers. *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 73 (1991) (and cases cited therein). Given the legislative purpose of the Act, we have construed its provisions liberally and given them expansive breadth.

The Act defines "employment" as any service performed by an individual for an employing unit. 820 ILCS 405/206 (West 2000). This court has acknowledged that the fact that the Act's specifications and definitions may embrace "employment" as it is customarily understood " ' "does not prevent its including within the statutory

terms" ' " those who before its enactment bore " ' "the relation of independent contractors, or other relations different from that strictly of employee at common law." ' " *Jack Bradley*, 146 Ill. 2d at 74, quoting *Beth Weber, Inc. v. Murphy*, 389 Ill. 60, 65 (1945), quoting *New York Life Insurance Co. v. Murphy*, 388 Ill. 316, 319 (1944). The Act contains various exemptions to the employment definition. Because the Act was enacted with the public welfare in mind, our construction of the Act's provisions "should favor inclusion," and the entity seeking the exemption bears a strict burden of proof. *Jack Bradley*, 146 Ill. 2d at 75.

In this case, Carpetland seeks to avail itself of the exemption for independent contractors contained in section 212 of the Act. The court correctly notes that the three requirements of this exemption are conjunctive, and that Carpetland must prove all three to exempt itself from the applicability of the Act. 201 Ill. 2d at 355. The court, however, considers the Director's decision, that Carpetland did not establish all three requirements with respect to the carpet installers, clearly erroneous. See 201 Ill. 2d at 396. In so doing, the court holds, *inter alia*, that Carpetland established the second requirement of section 212, *i.e.*, that the "service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed." 201 Ill. 2d at 383-86; 820 ILCS 405/212(B) (West 2000). I disagree.

The Director's report found that approximately 75% of Carpetland's floor-covering sales included the cost of installation. In other words, the customer paid installation costs to Carpetland in the great majority of its sales. The remaining percentage of Carpetland's sales consisted of carpeting or carpet pieces that did not require installation services. I note that this finding of fact was not

disputed by the parties. Moreover, no contrary evidence appears of record that would cast doubt as to its accuracy. In light of this, I see no reason to disregard the Director's finding that installation "is in the petitioner's usual course of business" as clearly erroneous. The evidence adduced certainly supports the view that carpet installation went hand-in-hand with wall-to-wall carpeting purchases at Carpetland, purchases which the record shows constituted the majority of Carpetland's sales.

Schatz, Pollack Woolen Co. v. Murphy, 384 Ill. 218 (1943), cited by the court in support of its conclusion that the Director erred in this respect, provides little reason for this court to disregard the Director's finding. In Schatz, the employer was engaged in the business of selling woolen goods to the tailoring trade. The company maintained an office and sample room in Chicago. The employee for whom the exemption was sought was a window washer who worked part-time at the office. This court held that, with respect to section 212(B), "[t]he washing of windows was not within the usual course of appellee's business in selling woolens to the tailoring trade. His services may have rendered the place of business more pleasant but they did not enter into any of the many activities necessary to the purchase of woolens and the resale of them to tailors." Schatz, 384 Ill. at 221. I have difficulty equating the service provided by the installers here with the services rendered by the window washer in Schatz. The installation of carpet, in my view, entails more than a mere pleasantry for the customers of Carpetland. Generally speaking, those who purchase carpeting do so with an expectation that it will be installed. Indeed, the installation of floor covering in the home or business of the purchaser is but one of "the many activities necessary" to the overall purchase of carpeting. For this reason, I do not believe that carpet installation can be deemed incidental to the sale in the

same way that the window washing in *Schatz* was found to be incidental to the sale of woolens.

The court also puts great weight on the fact that the sales agreements between Carpetland and its customers expressly excluded installation and that the practice merely constituted good business sense. I do not believe the sales contract alone is determinative of the question. If it were, employers would too easily be able to cloak their employees with the mantle of independent contractor in order to avoid making unemployment contributions under the Act. Notwithstanding that, however, Carpetland's willingness to "accommodate" the customer by arranging for installation services brought it more than just the goodwill alluded to by the court in its opinion. 201 Ill. 2d at 387. I note that the record reveals that Carpetland charged its customers a flat rate of $3 per yard for carpet installation. Carpetland, however, paid its installers a lesser amount, which ranged down to as low as $2.20 per yard. Thus, while the contract between Carpetland and its customers specifically excluded installation, the bottom-line price paid by the customer to Carpetland included the cost of installation and Carpetland profited from it directly. This is not a case, therefore, where the supplier gives its customer a list of installers and the customer is left to negotiate the price of installation directly with the installer as a separate financial transaction, with no profit returning to the supplier. It was Carpetland that selected the installer for the customer and set up the date of installation. If the selected installer declined the job, Carpetland would select another installer from its list of installers. Carpetland acted as a middleman between the customer and the installer and realized a monetary gain for doing so. This supports the view that carpet installation was part of Carpetland's usual course of business, especially when 75% of all of its sales were conducted in this manner.

The profits received from the installation and Carpetland's "hands-on" involvement bespeak more than a mere incidental convenience extended to customers.

The foregoing facts, in my view, adequately support a finding that the services provided by the installers were part of the usual course of Carpetland's business. Therefore, unlike my colleagues in the majority, I am not "left with the ' "definite and firm conviction" ' (*AFM*, 198 Ill. 2d at 395, quoting *United States Gypsum Co.*, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542) that the conclusions regarding carpet installation and Carpetland's usual course of business in the report and the Director's decision are erroneous." 201 Ill. 2d at 387.[1] Based upon this record, I believe that Carpetland failed to carry its strict burden of proof in demonstrating that its carpet installers were independent contractors. The Director, therefore, had substantial basis to conclude

---

[1]I realize that the two factors of section 212(B) are in the alternative, and that the installers might still fall within the ambit of subsection (B) if their services are performed outside all of Carpetland's places of business. Given the court's resolution of the "usual course of business" issue, it did not address the places of business factor *vis-à-vis* the installers. I would find, however, that Carpetland does not meet this factor. Illinois courts have recognized that any location where workers regularly represent an employer's interest will be considered a usual place of business for purposes of section 212(B). See *Ross v. Cummins*, 7 Ill. 2d 595 (1956); *Eutectic Welding Alloys Corp. v. Rauch*, 1 Ill. 2d 328 (1953). In my view, the installers represented Carpetland's interests. Customer complaints were directed to Carpetland and not to the individual installers. It was Carpetland who worked to resolve any problems arising from poor or substandard installation. Carpetland's attention to problem resolution indicates that it considered it in its best interests to work with customers when installation work was poorly performed. If Carpetland's interests were not implicated by the installation, then Carpetland would have let the customer deal directly with the installer in the event of problems. This was not the case and therefore supports a finding that the installers represented Carpetland's interests.

that the requirements of section 212(B) had not been met and that their services were employment subject to contributions under the Act.

JUSTICE McMORROW joins in this partial concurrence and partial dissent.