2022 IL App (1st) 200007

FIRST DISTRICT
SIXTH DIVISION
January 14, 2022

No. 1-20-0007

| | | |
|---|---|---|
| DENNIS J. O'MALLEY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| AUGUSTINE F. UDO; INTERNATIONAL | ) | |
| ASSET TRANSACTIONS, LLC; and | ) | No. 2017 L 01278 |
| IATMARKETS, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| (Augustine F. Udo, | ) | Honorable |
| | ) | James E. Snyder, |
| Defendant-Appellee and Cross-Appellant.) | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Dennis J. O'Malley, appeals the trial court's judgment that he was not an employee of defendants Augustine F. Udo, International Asset Transactions, LLC (IAT), and IATMarkets, LLC (IATM), pursuant to section 2 of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/2 (West 2018)). On appeal, plaintiff contends (1) the trial court erred in finding that plaintiff met all three conditions required for an independent contractor set forth in section 2, (2) reversal is warranted where the trial court mistakenly recalled the evidence at trial, and (3) he is entitled to a new trial on his claims under the Uniform Fraudulent Transfer Act (UFTA) (740 ILCS 160/1 *et seq.* (West 2018)). Defendant Udo filed a cross-appeal in which he

contends that the trial court erred in granting plaintiff's motion for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). For the following reasons, we reverse and remand for further proceedings on plaintiff's Wage Act claim but affirm the court's judgment on his UFTA claims. On Udo's cross-appeal, we affirm the court's judgment granting plaintiff's motion for sanctions and imposing against Udo $12,583.33 in attorney fees and $241.08 in costs.

¶ 2                                    I. JURISDICTION

¶ 3       The trial court entered judgment after a bench trial on April 17, 2019, and set briefing on plaintiff's motion for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). On June 17, 2019, plaintiff filed a motion to amend his complaint to add two claims under the UFTA, which the trial court allowed. On December 3, 2019, the court entered judgment in favor of defendants on the UFTA claims and entered judgment in favor of plaintiff on his motion for Rule 137 sanctions. Plaintiff filed his notice of appeal on December 31, 2019. Defendant Udo filed his cross-appeal on January 9, 2020. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                                    II. BACKGROUND

¶ 5       On April 18, 2018, plaintiff filed a complaint against defendants seeking compensation for his work at IAT from November 2004 to February 2015. IAT was a private company incorporated in 1989, with its principal office located in New York, New York. Defendant Udo, who resides in New York, founded IAT and also served as its president and chief executive officer. IAT sought to provide banks and their clients unique solutions to "the liquidity problems of a wide variety of financial assets." Plaintiff alleged that he was hired to improve IAT's business; to develop its

subsidiaries, IATSecuritization, LLC (IATS), and IATM; and "to introduce new asset securitization products to the marketplace."

¶ 6    Defendants were held in default for failing to answer the complaint, and on August 1, 2018, a joint and several default of judgment for $4,438,040.84 was entered against Udo, IAT, and IATM. Udo subsequently moved to vacate the default judgment against him, which the trial court granted. The default judgments against IAT and IATM remain.

¶ 7    One week before the trial on plaintiff's claims against Udo, Udo tendered his trial exhibits to plaintiff. The exhibits included documents Udo initially claimed he did not possess. Plaintiff filed a motion to bar the evidence and for sanctions pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002) and Rule 137 (eff. Jan. 1, 2018). The court granted the motion pursuant to Rule 219, finding that "[t]he defendant has just now tendered documents for its pretrial context, ones which had not been tendered before, but are responsive to a request for documents to which he answered none." The court ruled the documents inadmissible at trial. Proceedings on the Rule 137 motion for sanctions were continued until after trial.

¶ 8    At the bench trial, plaintiff testified that he resides in Evanston, Illinois. He has a degree in finance and an MBA from the University of Wisconsin-Madison, and has a law degree from the John Marshall Law School in Chicago. Plaintiff began his career at ABN AMRO and worked his way to head the company's credit business in North America. In 1988, he became the "co-head" of a group that worked on providing financing for leveraged buyouts. The business evolved to include assets securitization, which "was a way to provide financing for credit cards, auto paper, trade receivables, [and] term assets for customers of ABN AMRO in North America." In 2000, the

group built a "book of business" worth around $15 to $18 billion. At that time, plaintiff was appointed head of assets securitization for the company's North America operation.

¶ 9 In 2002, plaintiff became global head for asset-backed commercial paper for the company. In that capacity, he spent half his time in the United States and half his time in Europe. He was responsible for 10 conduits that provided financing for auto paper, credit cards, trade receivables and term assets. When he left ABN AMRO in 2004, the portfolio was "approximately $55 billion of financing on a daily basis," a program whose scale was second only to Citibank. Plaintiff left to look for "other and new endeavors."

¶ 10 In 2004, plaintiff was contacted by an investor who told him he might be interested in IAT. The investor had heard that IAT was developing an independent conduit for asset-backed commercial paper, and plaintiff had been part of a similar project at ABN AMRO. The investor wanted plaintiff to visit IAT and relay information on the company to him.

¶ 11 In November 2004, plaintiff went to New York and met with Udo and Bob Seery at IAT. They discussed a conduit called SuperLumina, which would provide financing for trade payables. Seery had a similar background as plaintiff, and they were "part of the same subculture" in the business. Afterwards, plaintiff met six or seven other IAT employees before meeting again with Udo. Udo told him of the progress they were making on the setup of SuperLumina and that "a number of things" had already been put in place.

¶ 12 Udo and Seery spoke to plaintiff about working with IAT, and he told them to prepare an offer. After plaintiff returned to Chicago, Seery called and offered him compensation of $1000 per day with expenses paid. Once the company was fully funded, plaintiff would have a base salary of $215,000 with benefits. Plaintiff accepted the offer. He would report to Seery and be responsible

for running the SuperLumina conduit, which included work "on the structure of the conduit, work with the rating agencies, [and] work with soliciting investors who would buy *** the commercial paper." The conduit work was with IATS, which was the subsidiary set up by IAT for conducting securitization transactions.

¶ 13    After plaintiff accepted, a notice went "out on the wires" announcing his position at IAT. He testified that this type of announcement was common in the business. The notice referred to plaintiff's role as "Senior Managing Director, IATSecuritization." The parties agreed that plaintiff would stay in Chicago and would travel to New York as needed, with his traveling expenses paid by IAT. Plaintiff subsequently set up a home office in Evanston, and IAT reimbursed him for his expenditures.

¶ 14    On November 29, 2004, plaintiff spoke with Seery about the team coming to Chicago to set up a "roadshow" for IAT. A roadshow was essentially a meeting between an entity looking for working capital to fund its business and potential investors. IAT would present a slideshow detailing the company's needs and how IAT would apply money from investors to its business. At the roadshow in Chicago, Udo introduced plaintiff as the person hired from Chicago. He also gave information on plaintiff's education and his business background at ABN AMRO in Chicago.

¶ 15    Plaintiff testified that, in 2005, an average day of work included regular phone calls with Seery, IAT's chief operating officer. Seery often conducted weekly meetings. A "large list of things" had to be done to get a conduit "up and running," and it was common for plaintiff to travel to meet with banks that were "providing information on the deal." At trial, plaintiff was presented with an organization chart for IATS created by Udo. He testified that the chart was used in a slideshow when they talked to investors about putting money in IATS and/or investing in asset-

backed commercial paper supported by SuperLumina. The chart accurately portrayed plaintiff's responsibilities in overseeing the administration of the conduit and the funding. IATS operated until 2006, when it "became apparent given what was going on in the bank market that we couldn't find bank liquidity in the program." IATS closed in 2007.

¶ 16     In 2006, Seery left IAT. Before leaving, he agreed to plaintiff's request to put his compensation arrangement with IAT in writing. Although the document was sent to plaintiff on September 5, 2006, the "Engagement letter" was dated November 26, 2004. The agreement, signed by Seery and plaintiff, provided:

> "As a confirmation to you, I received approval from the Management Committee ('MC') to formalize our discussions, where you would work for IAT as a consultant until we get funding, at which point you would come on board full time as a Senior Managing Director, reporting to me, and running the day to day responsibilities of the conduit. Your role as a consultant would in effect, begin your role as if you were full time.
>
> The $1,000 per day consulting fee, plus expenses, is acceptable to the MC. It is understood that you and I will track which days you would be working for us.
>
> The consulting engagement would begin Monday, November 29th, 2004. We can discuss the details on the phone over the next week.
>
> Once we are funded, you will be hired full time, with a minimum base salary of $215,000 and you will receive options in IAT LLC. The number of options will be determined as we formalize our agreement.

You would be eligible to participate in the company's incentive plan, which is formulaic and weighs more on equity participation, although cash bonuses will be paid with MC approved targets are met.

Lastly, this position will not require you to move to New York, but we will need to work the details as it relates to expenses and temporary housing."

¶ 17    After Seery's departure, Udo appointed plaintiff chief operating officer of IAT. Plaintiff testified that Seery and other employees left because they were not being paid their wages. Plaintiff, however, agreed to stay "based on an assurance that I would be made whole for what was owed to me." Starting in 2004, plaintiff sent monthly invoices to IAT and the controller, Ed Tippmann, kept track of what was paid and what was left unpaid. Plaintiff stated that his compensation was "$1,000 a day for the days that were worked," and he submitted invoices to Seery and Tippmann for payment on that basis. As of June 30, 2005, plaintiff was owed $141,000 of which he had been paid $28,000. He also submitted $10,939.64 in expenses of which he was paid $7756.14. As of August 1, 2006, the amount accrued and owing to plaintiff was $323,520.68.

¶ 18    Plaintiff testified that he continued to send invoices through 2007. He stopped in 2008, however, because he "wasn't getting any response on them." He explained that "[t]here was no point" because "[t]here were three people working in the business and it was obvious what I was doing." In 2008, he was the chief operating officer of IAT and served on the management committee. Plaintiff continued to work from his home office in Evanston, and Udo continued to work from New York. The other person working at IAT, Adam Dixon, was based in Vienna, Austria. IAT's offices remained in New York. During this time, Udo and plaintiff continued to meet with businesses and prospective investors.

¶ 19    In October 2008, Airbus signed a commitment to provide financing for their suppliers with IAT's product. They had to overcome "a variety of hurdles" to create the product for Airbus; therefore, documentation for the deal was not completed until 2012. Plaintiff, Udo, and Dixon worked daily on the project. By 2013, "it was up and operative." In late summer 2013, with Airbus established, they looked for additional capital to "build the business out."

¶ 20    Plaintiff received reimbursement for some expenses in 2012, but he had not received any other compensation. He and Dixon had discussions with Udo about payment options, including a stock option or restricted stock program, none of which materialized. Plaintiff was a signatory on the company's Bank of America account, and he saw "all the trades coming through." He believed that "the company was making a significant amount of money on the fees." However, when he demanded payment, Udo told him there was no money to pay him because of "other things that have to be paid for."

¶ 21    Plaintiff left IAT in February 2015. In May 2016, plaintiff sent an invoice to Udo for $2,316,700 in outstanding compensation owed to him. In December 2016, he received one more payment of $5000 for expenses.

¶ 22    At trial, plaintiff also testified regarding transactions involving Chase Bank accounts maintained by IAT, IATM, and Udo. From January 2010 through April 2018, Udo transferred $834,411 from an IAT account to Weinreb Management to pay rent for his apartment in New York. From August 1, 2016, through June 15, 2018, Udo transferred $149,221 from one of IAT's accounts to pay rent for his flat in London. Udo also made withdrawals from IAT and IATM accounts from September 2011 to July 2018, and from January 2011 to July 6, 2018, he transferred a total of $263,248.60 from one of IAT's accounts to his personal Chase Bank account. From

February 2009 to September 2017, Udo used IAT and IATM accounts to pay "unidentified recipients."

¶ 23    Seery testified that he headed the team putting together the securitization/conduit business for IAT. He signed an employment agreement and reported to Udo. He stated that when plaintiff joined the company, they issued a press release because it was an important event. Plaintiff "was deemed a pretty important person in the conduit space, the securitization space. So this represented a big plus for the organization." The organization chart of 2005 accurately reflected the roles people played in the development of the business. Udo was the ultimate decision maker regarding employment and compensation at IAT.

¶ 24    Seery acknowledged that "there was always a problem compensating employees." He explained that "the goal was to raise capital to build the business." It was a time-consuming, complicated process that required the effort of a lot of people. Capital was "critical *** [a]nd because we need people to do their jobs to get things done and we didn't have the money to pay them, we were looking for alternatives to kind of keep them part of the organization." They wanted to develop enthusiasm for staying with the company despite not getting paid. One idea involved raising outside capital to fund equity interests on behalf of employees/consultants as compensation for what had not been paid. Such deals, however, also required input from the investor providing the capital. Money owed to employees was "a special concern from an investor perspective."

¶ 25    Seery explained the difference between an employee getting wages and a consultant. Technically, an employee would get a paycheck, but he acknowledged that while he was there "it was few and far between." Consultants on the other hand would get a 1099 form and submit their

hours. In turn, they received "a cash gross without taxes being deducted." Seery testified that regardless of this distinction in compensation,

> "[e]verybody worked as if they were part of the business. Because we didn't want to, quote, burden the employee salary side of the expense equation and rely too heavily because of taxes and other reasons you pay an employee versus a consultant. The goal was to kind of identify those consultants who would come on full-time as employees once we're able to get capitalized and run the business."

Working at IAT was everyone's "main focus," and Seery was not aware "of people having sidelines, doing other things."

¶ 26    On cross-examination, Seery reiterated that plaintiff was hired as a consultant. In contrast, Seery was an employee who had medical benefits and was eligible for bonuses. He understood that plaintiff would come in as an employee "once we got capitalized," but the company was never capitalized while he was there. When Seery left in 2006, plaintiff was still a consultant. He testified that the engagement letter accurately reflected the terms of plaintiff's employment at IAT from November 2004 through September 2006. He acknowledged that, in the roadshows, plaintiff was presented as a member of the IAT team to investors and the presentation materials did not differentiate between employees and consultants. When he left the company in 2006, it was in "terrible financial condition." IAT could not pay its bills or its employees, and Seery was owed "a lot of money." He had spent 2½ years building the business, but Udo ultimately found the proposals from investors unsatisfactory. Thus, Seery "threw in the towel."

¶ 27    Dixon testified via deposition. He stated that plaintiff, along with Udo and Seery, was one of the "prime people" involved in launching the business. Plaintiff had "a very distinguished career

at ABN AMRO," and the conduit he built there, Windmill, was one of the largest in the world with over $50 billion in assets. Plaintiff "contributed significantly" to the concept of a securitization vehicle as a "most accomplished practitioner." Dixon stated that Udo's vision for the business was "to securitize all sorts of different things and make a fortune in an honorable way." They worked hard to pitch the business to investors so that IAT could obtain capital to continue operations and develop its business. These presentations were made in the course of IAT's "regularly conducted business activity."

¶ 28     Udo testified that IATS, a subsidiary of IAT, was "created expressly to run a conduit business." He explained that a conduit "is a financial vehicle through which you can hold different types of assets. And then you can provide financing against those assets by issuing what's termed commercial paper." Udo testified that a startup business would identify its prospective team so that investors "would know that these are the individuals and that their funding, in effect, would fund for them to then come on board as full-time employees." It was typical to give members of the team titles because investors needed to know the roles they would have in the company.

¶ 29     IAT was constantly engaged in raising funds, and plaintiff was identified as someone who could contribute to the business's development. Udo spoke with plaintiff, and he "seemed interested." When asked whether he would want to come in as an employee, plaintiff said "categorically, no, he wanted to be a consultant." Udo testified that plaintiff had reasons for wanting to remain independent. First, he had a large family in Chicago and did not want to relocate to New York, where IAT was located. Also, IAT was "a peddling startup company that wasn't funded and very risky. And it didn't make sense for somebody with an august resume, as he had

at that point, to risk that by committing himself as an employee to an unfunded entity." Plaintiff wanted to avoid legal liability if the venture failed.

¶ 30     Although plaintiff signed on as an independent consultant, he understood that once the company was funded, "he'd have the ability to convert to full-time" employee status. This arrangement was beneficial to the plaintiff because he kept his flexibility where there was no guarantee IATS would succeed as a business, and the company benefitted because it "was only obligated for whatever was invoiced for work." Udo agreed that the employment agreement signed by Seery and plaintiff represented the terms of plaintiff's engagement with ITA. He reiterated that plaintiff made it "abundantly clear that he had no interest in being an employee."

¶ 31     Udo testified that the financial crisis of 2007 and 2008 impacted financial services companies and placed them in a "dire" financial position. During that period, "[t]here was no business, no conduit business." Therefore, plaintiff would have devoted "minimal time" to the business. Instead, they had conversations about other prospective opportunities they "were trying to chase." Udo had phone conversations with plaintiff several times a week during that time.

¶ 32     While he worked at IAT, plaintiff was issued 1099 tax forms and he submitted invoices for payment pursuant to their agreement. Udo testified that he received no invoices from plaintiff after Seery left in 2006, until 2016. In May 2016, plaintiff submitted an invoice for approximately $2.3 million, 10 years' worth of services, which caught Udo by surprise. The company was not in a position to make that kind of payment. Udo stated that if he had known "this is what, in his mind, was going on" he would have told plaintiff, "No, we are done. We are terminated here."

¶ 33     Udo testified that pursuant to his employment agreement with IAT, he was entitled to an annual salary of $400,000. However, he last took that salary in 2000. Instead of taking the salary,

Udo made personal loans to the company because it was in "desperate straights [*sic*]." From 2008 to 2010, he loaned the company approximately $809,000. Upon the advice of his accountant, in 2009 IAT's offices moved from its location on 52nd Street in New York to Udo's New York apartment. The rent at 52nd Street was in excess of $25,000 per month, and the move considerably reduced the costs of the business. Udo testified that IAT and its subsidiaries are now "defunct." The one client they had, Airbus, ceased doing business with them in 2018.

¶ 34    On April 17, 2019, the trial court ruled in favor of defendants on plaintiff's claim that he was due wages under the Wage Act and was an employee of IAT. The court determined that plaintiff was instead an independent contractor where:

> "Seery testified that the plaintiff was insistent that the agreement not be employment. Seery testified that he offered employment to *** Mr. O'Malley and that Mr. O'Malley declined. Seery, O'Malley and Udo testified—each testified about the discussions between the three of them over this period of time.
>
> In light of all the testimony, my observation of the witnesses, their ability to remember the conversations and the extent to which their testimony was bolstered or undermined by the other evidence in the case, I believe that Mr. Seery's testimony that he offered O'Malley employment and that O'Malley declined employment, that he had preferred to establish a contractor relationship because the venture was speculative and he wanted to be able to pursue additional outside opportunity."

The court found that according to the testimony of Seery, Udo and O'Malley, the engagement letter "was intended to codify the relationship between plaintiff and IAT." The plain language of the agreement "undermines the testimony of O'Malley that he was offered employment and

supports the testimony of Seery that plaintiff would come on board as an employee with a salary once the company was funded." The court further found that O'Malley's agreement was different than the employment contract Seery signed. The agreement's reference to O'Malley as a "consultant" who would become "Senior Marketing Director" once IAT obtained funding, lent further credence to "defendants' claim and to the testimony of Seery and Udo that this document was not intended to be an employment contract, but rather a contract for services with an independent contractor."

¶ 35    Plaintiff's own testimony also confirmed that "he was offered a consulting contract with the prospect of future employment" and whatever payment plaintiff received from IAT would result from the submission of invoices. The trial court concluded that this method of irregular payment "more likely" described a contract for services between the parties rather than an employment contract.

¶ 36    The court also determined, by a preponderance of the evidence, that plaintiff was an independent contractor under section 2 of the Wage Act:

> "During the course of this work relationship, the plaintiff remained free from control and direction over the performance of his work. There is no evidence that the plaintiff was supervised in any way or given direction over his work. There were periods of several years where the plaintiff talked with Mr. Udo many times per week about his services and the prospects for investment and there is no evidence that he was directed or controlled about how to do these things.

* * *

Plaintiff worked on his own and did at times work through defendants' Chicago office, but it is clear that defendants' place of business was in New York City and the parties specifically agreed that he would not work in New York City.

\* \* \*

Plaintiff is an attorney, but it's clear his professional life has been in financial services. He has maintained various SEC licenses to conduct his profession. He was in an independently established occupation and maintained the right to operate a separate business and proprietary interest. The possibility was something that he stated was the goal of the relationship [with IAT], though it appears he did not pursue much other business."

¶ 37    The court noted that plaintiff already had a judgment against the corporate defendants for unpaid fees. The court also noted testimony that a substantial amount of fees generated at IAT went towards rent payments for Udo's New York and London apartments, which were characterized as office expenses. The court found, however, that the propriety of those payments was "not relevant to the pending cause of action. So no judgment is made on it."

¶ 38    On June 17, 2019, plaintiff moved to file a third amended complaint adding two counts under the UFTA. The trial court allowed the amendment, finding that defendant did not present an argument as to what additional or different testimony he would have produced at trial had he known of these additional counts. According to defendant's testimony, he believed "the proofs at trial would in fact defeat Plaintiff's proposed amendment to the pleadings."

¶ 39    The trial court stated it would rule on the UFTA claims based on the parties' written arguments. Plaintiff argued that four years before he filed his complaint through May 1, 2018, Udo transferred around $1,169,636.82 of company cash to himself or to third parties for his benefit and

such transfers were not for a proper corporate purpose. Plaintiff sought to void the transfers and recover those assets under the UFTA. In response, Udo denied that the transfers served no proper corporate purpose and denied plaintiff's fraud claims.

¶ 40    The trial court also considered plaintiff's motion for Rule 137 sanctions. Plaintiff argued that when defendant signed his responses to plaintiff's discovery requests, he certified "to the best of his knowledge information and belief formed after a reasonable inquiry" that his response was "well-grounded in fact" and "not interposed for any improper purpose." However, in his responses defendant falsely denied possession of certain documents which he later untimely produced as pretrial exhibits. On September 20, 2019, the court granted plaintiff's request for sanctions and ordered plaintiff to file a petition for attorney fees and costs with documentation. It set the hearing on the petition for December 3, 2019. The trial court would also rule on the UFTA counts on that date. The report of proceedings for that date is not in the record on appeal.

¶ 41    The trial court's written December 3, 2019, order stated:

> "This cause coming before the court on 1) Plaintiff's petition for attorneys fees and costs and 2) for ruling on Plaintiff's claims arising under the UFTA (counts VI and VII), due notice given, the matters fully briefed, counsel present and waiving any further evidentiary hearing as to the Petition for Attorneys Fees and Costs, and the Court being fully advised in premises, IT IS HEREBY ORDERED, for the reasons set forth in court,
>
>> 1) Plaintiff's Petition for Attorneys Fees and Costs is granted, and Defendant Udo is ordered to pay attorneys fees of $12,583.33 and costs of $241.08 to plaintiff; and
>>
>> 2) Judgment is for Defendant Udo on Counts VI and VII.
>>
>> 3) This is a final order."

¶ 42    Plaintiff filed this appeal, and Udo filed his cross-appeal.

¶ 43                                III. ANALYSIS

¶ 44                              A. Plaintiff's Appeal

¶ 45    Plaintiff appeals the trial court's determination that he was an independent contractor exempt from application of the Wage Act. Whether plaintiff qualifies as an employee under the statute is a mixed question of law and fact subject to the clearly erroneous standard of review. *Anderson v. First American Group of Cos.*, 353 Ill. App. 3d 403, 407 (2004). This standard of review grants some deference to the trial court's decision because a reviewing court will not disturb the trial court's findings unless they are clearly erroneous. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001). A determination is clearly erroneous when, after considering the entire record, a reviewing court is " 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 46    The purpose of the Wage Act is to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation. *Majmudar v. House of Spices (India), Inc.*, 2013 IL App (1st) 130292, ¶ 11. To prevail on a Wage Act claim, plaintiff must show that he is an employee and that he is owed wages by the employer pursuant to an employment agreement or contract. 820 ILCS 115/2 (West 2018). The trial court below disposed of plaintiff's Wage Act claim solely on the basis that plaintiff was not an employee under the statute. Therefore, the propriety of that ruling is the only Wage Act issue we consider in this appeal.

¶ 47    In finding in favor of Udo, the trial court determined that no employment relationship existed between plaintiff and IAT. It believed that plaintiff "declined employment, that he had

preferred to establish a contractor relationship because the venture was speculative and he wanted to be able to pursue additional outside opportunity." The court found that the plain language of the agreement "undermines the testimony of O'Malley that he was offered employment and supports the testimony of Seery that plaintiff would come on board as an employee with a salary once the company was funded." In the court's view, the agreement's reference to plaintiff as a "consultant" supported testimony that it was not intended to be an employment contract but instead was an agreement for plaintiff's services as an independent consultant.

¶ 48 The cardinal rule of contract interpretation is to give effect to the parties' intent as discerned from the language of the contract, given its plain and ordinary meaning. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). As such, the trial court found that pursuant to their agreement, the parties intended for plaintiff to be an independent consultant instead of an employee of IAT. However, it is also well established that plaintiff's status under the Wage Act is not controlled by how the parties referred to themselves in their agreement. *Cohen Furniture Co. v. Department of Employment Security*, 307 Ill. App. 3d 978, 982 (1999). Nor do common law principles pertaining to independent contractor status dictate whether plaintiff is an independent contractor or an employee under the Wage Act. *Id.* In fact, the Wage Act's definition of employee is much broader.

¶ 49 Section 2 of the Wage Act provides that " 'employee' " includes

"any individual permitted to work by an employer in an occupation, but shall not include any individual:

(1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

(2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and

(3) who is in an independently established trade, occupation, profession or business." 820 ILCS 115/2(1), (2), (3) (West 2018).

According to the plain language of the Wage Act, an employee is "any individual permitted to work by an employer in an occupation" (*id.* § 2) and this expansive definition is circumscribed only by the exemption for independent contractors provided by section 2. See *AFM Messenger*, 198 Ill. 2d at 397 (interpreting almost identical language found in the Unemployment Insurance Act (820 ILCS 405/100 *et seq.* (West 2000))). Since the three conditions "are phrased in the conjunctive, all three conditions must be satisfied for the independent-contractor exemption to apply." *AFM Messenger*, 198 Ill. 2d at 397. Therefore, anyone who fails to satisfy all three conditions "cannot be excluded from the class of people who are to be considered employees under this section of the" Wage Act. *Byung Moo Soh v. Target Marketing Systems, Inc.*, 353 Ill. App. 3d 126, 131 (2004).

¶ 50    Because the inability to satisfy any one of the conditions defeats a claim that the exemption applies, we need not consider whether plaintiff satisfied all three conditions. *AFM Messenger*, 198 Ill. 2d at 398. Here, we focus on the second condition, which requires plaintiff to "perform[ ] work which is either outside the usual course of business or is performed outside all of the places of

business of the employer." 820 ILCS 115/2(2) (West 2018). The factors in section 2(2) are in the alternative, meaning that the condition is met by the satisfaction of either prong. See *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 383-84 (2002).

¶ 51 Looking at whether plaintiff performed work outside IAT's usual course of business, the key inquiry is whether his services were "necessary to the business of the employing unit or merely incidental." *Id.* at 386. As our supreme court explained in *Carpetland*, the washing of windows for a business whose trade is " 'selling woolens' " may render the place of business more aesthetically pleasing, but it is not " '*necessary* to the purchase of woolens and the resale of them to tailors.' " (Emphasis in original.) *Id.* at 385-86 (quoting *Schatz, Pollack Woolen Co. v. Murphy*, 384 Ill. 218, 221 (1943)). However, "sales calls made by sales representatives are in the usual course of business" because the calls are necessary for the business to exist. *Id.* at 386.

¶ 52 IAT was in the business of providing banks and their clients with unique solutions to "the liquidity problems of a wide variety of financial assets." One product IAT was developing for that purpose was the SuperLumina conduit. Udo testified that IATS, a subsidiary of IAT, was "created expressly to run a conduit business." Plaintiff was initially hired to run IATS's SuperLumina conduit, which included work "on the structure of the conduit, work with the rating agencies, [and] work with soliciting investors who would buy *** the commercial paper." IAT wanted plaintiff's services because the conduit he built during his "very distinguished career at ABN AMRO" was one of the largest in the world with over $50 billion in assets. Dixon testified that plaintiff "contributed significantly" to the concept of a securitization vehicle as a "most accomplished practitioner." Clearly, plaintiff's work at IAT was necessary to the business.

¶ 53    Since IAT was a start-up company, finding investors to fund it was also a main activity of the company. Udo testified that the company was constantly engaged in raising funds and plaintiff was identified as someone who could contribute to the business's development. A start-up business like IAT identified its prospective team to investors so that they "would know that these are the individuals and that their funding, in effect, would fund for them to then come on board as full-time employees." It was typical to give members of the team titles because investors needed to know the roles they would have in the company. Dixon testified that he, plaintiff, and Udo worked hard to pitch the business to investors so that IAT could obtain capital to continue operations and develop its business. According to Dixon, these presentations were made in the course of IAT's "regularly conducted business activity." Thus, plaintiff's work as a member of the team pitching IAT and its products to potential investors was also necessary to the business. For these reasons, we find plaintiff does not satisfy the requirement that his work be outside the employer's usual course of business.

¶ 54    Since section 2(2) is phrased in the alternative, we also must consider whether plaintiff performed his work "outside all of the places of business" of IAT. See 820 ILCS 115/2(2) (West 2018). The trial court found that plaintiff satisfied this condition because "it is clear that defendants' place of business was in New York City and the parties specifically agreed that he would not work in New York City." While IAT's physical place of business is a relevant factor, an employer's place of business can also "extend to any location where workers regularly represent an employer's interest." *Novakovic v. Samutin*, 354 Ill. App. 3d 660, 669 (2004) (citing *Carpetland*, 201 Ill. 2d at 389-91).

¶ 55   Pursuant to his agreement with IAT, plaintiff worked from his home office in Evanston. However, the mere fact plaintiff performed work for IAT out of his home office is not enough to extend IAT's place of business to his home office. *Carpetland*, 201 Ill. 2d at 389. If that were the test, the independent contractor exemption would be rendered meaningless "because any place in which a worker performed an agreed-upon service, even his own home or office, would become the place of business of the party who hired him." *Id.*

¶ 56   Significant here, plaintiff not only worked for IAT out of his home office, but he also presented at roadshows on behalf of IAT and traveled to attend meetings with banks and potential clients of the company. Udo testified that the company was constantly engaged in raising funds. Essentially, plaintiff's job at these meetings was to help "sell" IAT and its products to banks and prospective investors so that IAT could obtain funds to operate and develop its business. Given his background and experience, he was particularly qualified for the work.

¶ 57   IAT understandably used every opportunity to connect plaintiff with its business. Seery testified that when plaintiff joined the company, IAT issued a press release because he "was deemed a pretty important person in the conduit space, the securitization space. So this represented a big plus for the organization." At the roadshows, Udo presented plaintiff to investors as the managing director of IATS. Documents prepared for these meetings showed plaintiff's position in the management structure of IAT. Any location where plaintiff performed necessary work for IAT and was represented to others as an employee of IAT is IAT's place of business for purposes of section 2(2). See *id.* at 391 (finding that when a salesperson for Carpetland "visits a customer's premises to obtain measurements necessary for the quoting of a price and the closing of a sale, he

is 'representing his employing unit's interest' " and "the premises being measured are [the employer's] place of business").

¶ 58 After considering the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger*, 198 Ill. 2d at 393. Since plaintiff's employment did not satisfy either prong set forth in section 2(2), he is an employee for purposes of the Wage Act. *Byung Moo Soh*, 353 Ill. App. 3d at 131. Therefore, we reverse the trial court's judgment that plaintiff was an independent contractor and remand the cause for further proceedings. We reiterate that this is the only Wage Act issue considered in this appeal, and we make no judgment on the merits of plaintiff's Wage Act claim as a whole.

¶ 59 Plaintiff also appeals the trial court's judgment against him on his UFTA claims. The standard of review after a bench trial is whether the judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise, Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). A determination is against the manifest weight of the evidence only when the opposite conclusion is apparent or the court's findings are unreasonable, arbitrary, or not based on the evidence. *Id.* Where there is contradictory testimony that could support conflicting conclusions, a reviewing court will not disturb the trial court's determination based on the testimony unless a contrary finding is clearly apparent. *Id.*

¶ 60 The trial court's December 3, 2019, order states that "for the reasons set forth in court," it found against plaintiff on his UFTA claims. However, the transcript of the proceedings on plaintiff's UFTA claims are not in the record on appeal. As a result, we do not know the trial court's findings or reasoning in making its judgment. With no knowledge of the trial court's findings, we cannot determine whether they were against the manifest weight of the evidence. As

the appellant, plaintiff has the burden of presenting a sufficiently complete record of the proceedings at trial to support his claim of error, and in the absence of such a record, we must presume that the order entered by the trial court conformed with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Presumption of the trial court's correctness is especially strong where, as here, the written order indicated that the court was "fully advised in the premises." (Internal quotation marks omitted.) *Smolinski v. Vojta*, 363 Ill. App. 3d 752, 758 (2006).

¶ 61                                B. Udo's Cross-Appeal

¶ 62    In his cross-appeal, Udo contends that the trial court erred in granting plaintiff's motion for Rule 137 sanctions against him and imposing as sanctions $12,824.41 in attorney fees and costs. On April 8, 2019, plaintiff filed a motion to bar evidence and for sanctions pursuant to Rules 219 and 137. The motion was based on Udo's "refus[al] to answer discovery requests in good faith" and his denial that he possessed "responsive documents." Plaintiff alleged that at the April 4, 2019, pretrial conference, Udo presented his proposed trial exhibits that included documents he denied having in his possession or control. As relief, plaintiff requested that Udo be "(a) barred from using those trial exhibits he denied having; (b) barred from asserting the defenses to which those trial exhibits relate; and (c) as a sanction for violating Supreme Court Rules, pay the plaintiff's attorney fees and costs incurred in obtaining this relief."

¶ 63    At a pretrial hearing, the trial court granted the motion to bar evidence pursuant to Rule 219 because Udo "just now" tendered documents "which had not been tendered before, but are responsive to a request for documents to which he answered none." The court, however, continued

the cause regarding plaintiff's Rule 137 sanctions request because it presented "a whole other matter" that may require an evidentiary hearing.

¶ 64    After trial, the court held a hearing on the motion for Rule 137 sanctions. On September 20, 2019, the court granted plaintiff's request for sanctions pursuant to Rule 137 and ordered plaintiff to file a petition for attorney fees and costs incurred in bringing his motion. After setting a briefing schedule, the court scheduled the hearing for December 3, 2019. We note that although the record contains the court's September 20, 2019, order, the second page of the three-page order is missing. That page appears to be the one containing the trial court's reasoning and findings. Also, a transcript of the hearing on the motion is not included in the record on appeal.

¶ 65    Udo argues that the imposition of Rule 137 sanctions was inappropriate where plaintiff already received a remedy for his failure to produce documents in discovery. The trial court had barred the evidence from trial under Rule 219, and Udo argues that Rule 219 was the proper vehicle for addressing the discovery violation. He contends it is not appropriate to use Rule 137 as a sanction for discovery violations.

¶ 66    We note, however, that plaintiff did not request Rule 137 sanctions for the discovery violation *per se*. Rather, plaintiff sought Rule 137 sanctions because Udo signed his discovery responses and certified that his answers were well grounded in fact and not interposed for an improper purpose. Although Udo certified that he did not have documents responsive to plaintiff's request, he later produced such documents as exhibits a week before trial without explanation.

¶ 67    Rule 137 states that the attorney's signature on a pleading certifies "that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law *** and that it is not interposed for any improper purpose." Ill. S. Ct.

R. 137(a) (eff. Jan. 1, 2018). If any pleading is signed in violation of this rule, the court may impose "an appropriate sanction." *Id.* An appropriate sanction includes an order to pay the other party's "amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee." *Id.* The trial court's decision to impose Rule 137 sanctions is given great deference and will not be reversed absent an abuse of discretion. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 487 (1998).

¶ 68    Here, the trial court's complete order is not in the record, nor do we have a transcript of the hearing on plaintiff's motion for Rule 137 sanctions. As the appellant on this issue, Udo is responsible for presenting a full record supporting his claim of error. In the absence of a complete record, we must presume that the trial court's judgment conformed with the law and had sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92. Without a transcript of the hearing at which the motion was argued and ruled upon, we have no basis to hold that the trial court abused its discretion in granting plaintiff's motion. Accordingly, any doubts arising from the incomplete record must be resolved against Udo on this issue.

¶ 69    Udo's next claim of error is that the trial court's sanction of $12,824.41 in attorney fees and costs against him had no proper basis and was excessive. He contends that plaintiff presented a "faux invoice" and, as such, failed to prove he actually incurred those fees and costs. "A petition for fees must present the court with detailed records containing facts and computations upon which the charges are predicated and specifying the services provided, by whom they were performed, the time expended and the hourly rate charged." *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1072 (1993). The trial court has broad discretion in awarding attorney fees, and a reviewing court will not reverse the trial court's decision absent an abuse of

discretion. *3432 West Henderson Building, LLC v. Gizynski*, 2017 IL App (1st) 160588, ¶ 40. In assessing the reasonableness of fees, "[a] court may consider a multitude of factors, including the nature of the case, its difficulty level, the skill and standing of the attorney, the degree of responsibility required, the usual and customary charges for similar work, and the connection between the litigation and the fees charged." *Id.* Furthermore, the trial court may use its knowledge and experience to ascertain the time required to complete a particular task, and a reviewing court will not reverse an award merely because it could have reached a different conclusion. *U.S. Bank National Ass'n v. Randhurst Crossing LLC*, 2018 IL App (1st) 170348, ¶ 78.

¶ 70    The trial court ordered plaintiff to present a fee petition with documentation and set the petition for a hearing on December 3, 2019. In response to the petition, Udo presented the same arguments he now makes on appeal. After the hearing, the court entered an order awarding plaintiff $12,583.33 in attorney fees and $241.08 in costs "for the reasons set forth in court." The transcript of this hearing, however, is not in the record. In the absence of a complete record, we must presume that the order entered by the trial court conformed with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92.

¶ 71                                IV. CONCLUSION

¶ 72    For the foregoing reasons, we reverse the trial court's judgment that plaintiff was not an employee under the Wage Act. However, we affirm the judgment for Udo on plaintiff's UFTA claims and the judgment granting Rule 137 sanctions against Udo, as well as the amount of attorney fees and costs thereby imposed. We remand the cause for further proceedings consistent with this opinion.

¶ 73    Affirmed in part and reversed in part; cause remanded.

**No. 1-20-0007**

| | |
|---|---|
| **Cite as:** | *O'Malley v. Udo*, 2022 IL App (1st) 200007 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2017-L-01278; the Hon. James E. Snyder, Judge, presiding. |
| **Attorneys for Appellant:** | Edward T. Joyce, Jacob L.V. Armstrong, and Rowena T. Parma, of Law Offices of Edward T. Joyce & Associates, P.C., and Joan M. Mannix, of Law Office of Joan M. Mannix, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Augustine F. Udo, of London, United Kingdom, appellee *pro se*. |